UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCHES OF SEVERAL LOCATIONS AND VEHICLES | Mag. Nos. 21-1255 through 21-1268 |
| --- | --- |
| | **[UNDER SEAL]** |

**AFFIDAVIT/APPLICATION FOR SEARCH WARRANTS**

I.    **Introduction**

    A.    **The Drug Trafficking Investigation and the Indictments**

I, Jeffrey T. Morell, a Drug Enforcement Administration Task Force Officer, being duly sworn, state as follows:

Search warrants are being sought with this affidavit/application as part of an investigation of drug trafficking in Mercer County and Lawrence County in Western Pennsylvania.  Many of the subjects of the investigation are part of a close-knit crew who are connected through family and friendship and have been convicted of felony crimes in the past.  The investigation has revealed that its subjects are involved in acquiring heroin/fentanyl and cocaine/crack, as well as other controlled substances, from interstate sources of supply. The investigation has further revealed that several of the subjects are serving as significant sources of supply for other drug dealers throughout Mercer and Lawrence Counties and beyond.

The investigation resulted in the return of two multi-count federal indictments in this district in June 2021.  The indictments charge drug trafficking and money laundering crimes.  One of the indictments charges FORREST GILMORE, MELVIN DORSEY-PACE, and RAYJZON SAMS with conspiring to distribute, possessing with intent to distribute, and/or distributing crack cocaine and cocaine between June 2020 and June 2021.

The other indictment charges the following defendants with conspiring to distribute, possessing with intent to distribute, and/or distributing fentanyl, heroin, crack cocaine, cocaine, and methamphetamine, between June 2020 and June 2021, within 1,000 feet of schools, playgrounds, and public housing: LONDON PINKINS, JACKIE BELL, ALBERT CUMMINGS, JIMMY GADSON, HAROLD HOOTEN, TORLANDO HOPSON, ALPHONSE JOHNSON, JERMALL JOHNSON, AMANDA KARWOWSKI, MICHAEL LOVE, KATLYN MCGIRR, KENNETH MILLER, NICHOLAS OSTHEIMER, EUGENE PHILLIPS, QUINTON PINKINS, JOSEPH PUMPHREY, COURTNEY PURDY, JERONTE ROBINSON, JAMMAR SHELTON, JAMES WEST, KHIRY WHITESIDE, and DENZEL WILLIAMS.

**B.      The Search Locations and Vehicles**

The following are the locations and vehicles for which search warrants are being applied for:

(1) **718 Lee Avenue, Farrell, PA/"Lee Avenue Location":** This location is a two-story, single-family house with a covered front porch and an attached wooden wheelchair-style access ramp. The numbers "718" are to the right of the front door.  This is the residence of Quinton PINKINS that he uses to traffic illegal drugs.

(2) **596 Sherman Avenue, Sharon, PA/"Sherman Avenue Location":** This location is in a two-story, multi-family duplex.  The front door for the location is on the left side of the covered front porch. The number "596" is displayed to the right of the location's front door.  This is the residence of Jimmy GADSON that he and others use to traffic illegal drugs.

(3) **402 Hamilton Avenue, Farrell, PA/"Hamilton Avenue Location":** This location is a two-story, single-family house with brick porch pillars. The number "402" is above the porch. This is the residence of Denzel WILLIAMS that he uses to traffic illegal drugs.

(4) **47 Woodrow Court, Sharon, PA/"Woodrow Court Location":** This location is a two-tone, two-story, single-family residence with a covered front porch. The number "47" is to the left of the front door. This is the residence of London PINKINS's mother that he uses to traffic illegal drugs.

(5) **67 Euclid Avenue, Sharon, PA/"Euclid Avenue Location":** This location is a two-story, single-family house with a covered front porch and a detached garage located on the side. The number "67" is on the left front-porch pillar. This is the residence of Jeronte ROBINSON that he, London PINKINS, and others use to traffic illegal drugs.

(6) **16 Cathedral Drive, Farrell, PA/"Cathedral Drive Location":** This location is an apartment in a building containing four separate apartments. This location is in the northwest corner of the building. It can be entered directly from the outside via the apartment's front door. The number "16" is above the front door. This is the residence of Kenneth MILLER that he, London PINKINS, and others use to traffic illegal drugs.

(7) **240 Orange Drive Apartment #3, Hermitage, PA/"Orange Drive Location":** This location is an apartment in a multi-unit, row-style apartment building. The number "240" is on the apartment building. The number "3" is above the front door of the location. This is the residence of Nicholas TANTUO that he, London PINKINS, and others use to traffic illegal drugs.

(8) **1054 Woodland Place, Sharon, PA/"Woodland Place Location":** This location is a single-family house.  The numbers "1054" are above the front door.  A driveway is on the side of the location.  This is the residence of Nicholas OSTHEIMER that he, London PINKINS, and others use to traffic illegal drugs.

(9) **302 East Home Street, New Castle, PA/"Home Street Location":** This location is a single-family house, with white siding on the exterior, and a driveway behind the house that is adjacent to an alleyway on the right side of the house. The front door is located under an overhanging porch roof with the number "302" affixed to the side of the door.  This is the residence of Forrest GILMORE's mother that he and others use to traffic illegal drugs.

(10) **117 West Terrace Avenue, New Castle, PA/"Terrace Avenue Location":** This location is a two-story, single-family house with gray siding and a covered front porch.  The front door is located to the left side of the front porch.  The house number "117" is affixed to the mailbox located to the left of the front door.  There is an alleyway located to the right of the house that leads to a parking area at the rear of the house.   This is the residence of Melvin DORSEY-PACE that he and others use to traffic illegal drugs.

(11) **White Cadillac with OH Temporary Registration M545192/"White Cadillac":** This vehicle is registered to Emma PINKINS at 724 Lee Ave, Farrell, PA 16121. As established below, this vehicle is used by Quinton PINKINS to traffic illegal drugs.

(12) **Dodge Dart with PA License Plate LFG1087/"Dodge Dart":** This vehicle is registered to Debra GADSON at 3839 Quaker Circle, Hermitage, PA 16148. As established below, this vehicle is used by Jimmy GADSON to traffic illegal drugs.

(13)    **White Jeep Grand Cherokee with PA License Plate LPM3309/"White Jeep"**: This vehicle is registered to Jasmine PEGUES at 1129 Hamilton Avenue, Farrell, PA. As established below, this vehicle is used by London PINKINS to traffic illegal drugs.

(14)    **Tan Chevrolet Cobalt with PA License Plate LGE8180/"Tan Cobalt"**: This vehicle is registered to Delisa SMITH at 328 Sterling Ave. Apt. D2, Sharon, PA. As established below, this vehicle is used by Nick TANTUO to traffic illegal drugs.

C.     **Affiant Training and Experience**

I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, a Pittsburgh DEA HIDTA Group 62 Task Force Officer who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

I have been a full-time, federally deputized Task Force Officer with DEA since July 2020. I have been employed by the Lawrence County (Pennsylvania) District Attorney's Office as a Narcotics Detective since 2014. I have participated in numerous investigations involving the unlawful distribution of controlled substances, including cocaine, heroin, and fentanyl, in violation of Title 21, United States Code, Sections 841, 843, and 846. These investigations have utilized undercover officers, confidential informants/sources, physical surveillance, electronic surveillance, pen registers, and telephone toll analysis. Prior to becoming a full-time DEA TFO, I served as a case-specific, federally deputized TFO for the ATF and DEA on several occasions. I have been qualified as a drug-trafficking expert in state court and have testified at numerous drug-trafficking trials.

As a result of my training and experience, I am familiar with the methods used by traffickers to smuggle, store, and distribute drugs, and to collect and launder drug proceeds. I am also familiar with the methods used by traffickers to insulate their illegal activities from law enforcement detection. For instance, I know members of trafficking organizations routinely utilize electronic communications facilities, including cellular telephones, and mobile-communication applications, like Snapchat, Instagram, and Facebook Messenger, to communicate about illegal activities.

I know that it is a common practice for drug traffickers to utilize multiple telephones (often, but not always, pre-paid cellular telephones), counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from detection by law enforcement. Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual. Drug traffickers often require the use of a telephone facility to negotiate times, places, prices, and schemes for importing, possessing, concealing, and distributing controlled substances and for arranging the disposition of proceeds derived from the sale of controlled substances.

I am familiar with the coded language and deceptive linguistic practices typically used by drug traffickers. I have spent many hours reviewing and transcribing such coded language in preparation for federal indictments and trials. This process of reviewing and transcribing thousands of intercepted communications between drug traffickers, in conjunction with my other experience summarized above, has confirmed beyond any reasonable dispute that it is now a very common practice for drug traffickers to utilize all

6

communication features of their telephones, most notably the voice-call and text-message features, nearly simultaneously to communicate with their conspirators.  For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages.  In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice-call feature, to further his/her criminal activities while not also using another feature, such as the text-message feature, to further his/her criminal activities.

This application/affidavit is being submitted for the specific purpose stated herein. I have not, therefore, included every fact known to me concerning the investigation.  In addition, it should be noted that the interpretations of communications discussed below are based on the results of this investigation so far, my training and experience, and the training and experience of other law enforcement officers who are involved in this investigation.

**D.      Evidence Commonly Generated by Drug Trafficking and Money Laundering**

I am aware that people who are involved in trafficking illegal drugs and/or laundering drug trafficking proceeds commonly store items related to their crimes at their residences or stash houses or at the residences of relatives or other trusted associates.  I am also aware that the following kinds of evidence have been recovered in a substantial number of residential/stash house and vehicle searches conducted in connection with drug trafficking and money laundering investigations:

1) controlled substances;

2) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters,

grinders, glass panes, mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3) books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4) personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, unlawful firearm possession, money laundering, and the criminal use of communication facilities;

5) cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders, wire transfers, cashier's checks and receipts, bank statements, checkbooks, and tax return information, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6) documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and

hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7)  computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, unlawful firearm possession, and money laundering; including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)  firearms and other dangerous weapons;

9)  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices; and

10) evidence that rebuts common defenses, such as evidence that demonstrates drugs were not possessed for personal use and the absence of legitimate income to cover expenses.

Based upon my training and experience, as well as the collective knowledge and experience of other officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, drug records, cell phones, and weapons at or in their residences and stash houses (including garages, outbuildings, and nearby vehicles) or at or in the residences and vehicles of relatives or other trusted associates.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past and for payments expected as to the traffickers' suppliers and the traffickers' dealers.

It is also a generally common practice for traffickers to conceal inside their residences or stash houses or businesses or vehicles, or inside the residences or businesses or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be used to purchase controlled substances.  Drug traffickers sometimes make use of wire transfers and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences, stash houses, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, stash houses, businesses, and vehicles.

When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers. In so doing, they may acquire property, services, and personal identification items under their assumed or alias names. They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

11

The cell phone, in addition to weapons, is a primary tool of the drug trade.  Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business.  Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones.  The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

I am also aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices.  I am also aware that

drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds. Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a

file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are often automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus,

the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

Based on my training and experience, I am aware that each of the following parts of a cell phone is likely to contain evidence of the crimes referenced herein. Such evidence can extend beyond evidence that directly establishes what crime was committed and by whom to evidence that establishes who used the cell phone and/or when and/or from where. Such cell-phone attribution evidence is particularly important because it links the user of the subject cell phone to the substantive evidence on the subject cell phone; it can link other users of other cell phones to the substantive evidence on the subject cell phone; and it can link the user of the subject cell phone to the location where the subject cell phone was found or where the subject cell phone was previously located based on location information stored on the cell phone. Moreover, parts of a cell phone that demonstrate the use of the cell phone to perform functions beyond communicating and recording photos/videos, such as to search the Internet or find addresses/directions, can be important to an investigation of the crimes referenced herein because cell phones are frequently used to prepare for crimes (e.g., to shop for tools of the particular criminal trade) and to complete individual criminal acts (e.g., travel to/from the location of the particular crime).

(1)     incoming and outgoing call and text message logs

(2)     contact lists

(3)     photo and video galleries

(4)     sent and received text messages

(5)     online searches and sites viewed via the internet

(6)     online or electronic communications sent and received, including email, chat, and instant messages

(7)     sent and received audio files

(8)     navigation, mapping, and GPS files

(9)     telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

(10)    call forwarding information

(11)    messages drafted but not sent

(12)    voice messages

## II.     Probable Cause

### A.     Recidivism

The investigation has revealed that its subjects are responsible for the distribution of quantities of heroin/fentanyl and cocaine/crack, as well as other controlled substances, in Western Pennsylvania and beyond.  Several of the subjects continue to engage in large-scale narcotics trafficking and money laundering despite significant prior convictions and prison sentences.  Some of the subjects are under court supervision as a result of prior convictions.  A summary of the criminal records of some of the subjects follows.

* Jimmy GADSON: GADSON has multiple criminal convictions, including a federal drug-trafficking conviction in this district.   In 2011, GADSON was convicted in federal court for distributing at least five grams of crack cocaine.  He was sentenced to five years in prison to be followed by five years of supervised release.  GADSON was thereafter released to supervised release and violated his

16

conditions on multiple occasions resulting in multiple revocations.  In 2015, his supervised release was revoked for multiple violations, including absconding to Georgia, and he was sentenced to five months in prison to be followed by three years of supervised release.  Later in 2015, after his release back to supervised release, his release was revoked again for multiple violations.  He was sentenced to 10 months in prison followed by 18 months of supervised release.  In 2017, GADSON's supervised release was revoked again for multiple violations resulting in a prison sentence of 12 months plus 1 day to be followed by 18 months of supervised release.  In 2019, his supervised release was revoked again for multiple violations.  He was sentenced to 11 months in prison with no supervised release to follow.

* Forrest GILMORE: In 2016, GILMORE was sentenced in federal court in this district to 60 months in prison, followed by 4 years of supervised release, for conspiring to distribute at least 28 grams of crack cocaine.  The conviction was a result of an investigation that focused on a violent crew based in New Castle, Lawrence County, Pennsylvania.  GILMORE was a significant member of the crew.  He and his co-conspirators (1) obtained crack cocaine from Buffalo, New York, (2) distributed the crack cocaine in Lawrence County, (3) obtained illegally acquired guns in Lawrence County, and (4) distributed the guns in Buffalo. GILMORE was released to federal supervised release in April 2020.  Within two months, if not sooner, he was once again distributing large quantities of crack cocaine from Buffalo, as well as powder cocaine and fentanyl, and engaging in

violence.  This has been confirmed by, among other things, confidential source ("CS") information, controlled buys, electronic surveillance, and cell phone data.

* Melvin DORSEY-PACE: In 2016, DORSEY-PACE was sentenced in federal court in this district to 60 months in prison, followed by 4 years of supervised release, for conspiring to distribute at least 28 grams of crack cocaine.  The conviction was a result of an investigation that focused on the violent crew, based in New Castle, Lawrence County, Pennsylvania, that GILMORE was also a member of as stated above.

* London PINKINS: London PINKINS has multiple prior criminal convictions.  In 2017, he was convicted in the Mercer County Court of Common Pleas for drug trafficking.  He was sentenced to 6 to 18 months in prison.  In 2014, he was convicted of possession of a prohibited offensive weapon and sentenced to probation.

* Nicholas OSTHEIMER: In 2017, OSTHEIMER was convicted in the Mercer County Court of Common Pleas for carrying a firearm without a license and sentenced to 9 to 18 months in prison.

* Jammar SHELTON: SHELTON has been convicted of committing several crimes throughout the last 20+ years.  These convictions include six robbery convictions in 1996 and four drug possession convictions in 2008, 2009, 2015, and 2020.

* Rayjzon SAMS: SAMS has a significant criminal record that includes 2012 drug trafficking and aggravated assault convictions in the Lawrence County Court of Common Pleas.

* Quinton PINKINS: Quinton PINKINS's criminal record includes a 2012 drug trafficking conviction in the Mercer County Court of Common Pleas for which he was sentenced to 6 to 18 months incarceration.  His criminal record also includes another drug trafficking conviction in 2017 in the Mercer County Court of Common Pleas for which he was sentenced to 4 ½ to 12 months incarceration.

**B.     Confidential Source Information**

**1.     Confidential Source 1**

Since April 2019, case agents for this investigation have been in direct, personal contact with a cooperating source referred to herein as "CS1."   The case agents believe CS1 to be reliable and credible because, as demonstrated herein, much of CS1's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS1's control.  The case agents have had multiple in-person discussions with CS1 about CS1's knowledge of ongoing criminal activity in Western Pennsylvania, including the narcotics-trafficking activities of members of the DTO.

CS1 is not an anonymous source.  The agents' interactions with CS1 have been in-person and CS1 was fully aware that the agents knew CS1's identity.  CS1 originally agreed to cooperate with law enforcement in this investigation and others for leniency on pending criminal charges and is now cooperating for monetary compensation.  The requirement that CS1 provide only truthful information was stressed to CS1 at the beginning of CS1's cooperation. CS1 was previously convicted of assault and drug possession/paraphernalia crimes.

The following is some of the information provided by CS1 to investigators since November 2020 during face-to-face and telephonic meetings:

19

a.  CS1 explained that he/she was previously introduced to London PINKINS and that he/she knows that PINKINS has the capability of supplying CS1 with multiple controlled substances. CS1 was provided an official state photograph of PINKINS, absent biographical information, and positively identified PINKINS.

b.  Members of the DTO utilize numerous areas within and surrounding the Mercer County cities of Farrell and Sharon, PA, to conduct narcotics transactions with customers. These locations include housing projects, convenience stores/gas stations, and various locations in the cities of Sharon and Farrell. Law enforcement has corroborated much of this information through physical surveillance.  For example, on October 15, 2020, surveillance agents observed Nicholas OSTHEIMER conduct a suspected narcotics transaction with a customer in the parking lot of 505 East State Street, Sharon, PA.

c.  Members frequently change the areas they meet customers, to thwart law enforcement efforts conducting surveillance.

d.  Members utilize multiple areas within Sharon and Farrell, PA, as "stash" locations, or locations to hide narcotics, firearms, and/or money. For example, 596 Sherman Avenue, Sharon, PA (i.e., the **SHERMAN AVENUE LOCATION**), is a location utilized by London PINKINS and OSTHEIMER to store, conceal, and package their controlled substances. This information has been corroborated by law enforcement through electronic and physical surveillance.

20

e.  Members are often seen by CS1 conducting counter-surveillance and driving in rental vehicles that they change frequently.  This information has been corroborated by law enforcement through physical surveillance.  For example, on October 1, 2020, agents observed OSTHEIMER operating a Chevy Malibu rental vehicle registered to Knott Rental Incorporated located in Brookfield, OH. This observation occurred during a controlled purchase of heroin from OSTHEIMER in Farrell, PA.

f.  CS1 has conducted a controlled purchase of narcotics from London PINKINS.

### 2. Confidential Source 2

Confidential Source 2 ("CS2") has been cooperating with law enforcement officers since June of 2020.  CS2 was originally motivated by the potential to receive a reduction in possible criminal charges and is now motivated by monetary compensation.  CS2 was previously convicted of drug possession/paraphernalia. CS2 has provided historical and current information on members of the DTO.  CS2 has direct access to the cellular telephone numbers used by members of the DTO as these members have consistently provided CS2 with those numbers in the past.

The case agents believe CS2 to be reliable and credible because, as demonstrated herein, much of CS2's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS2's control.  CS2 is not an anonymous source.  Agents' interactions with CS2 have been in-person and CS2 was fully aware that the agents knew CS2's identity.  The requirement that CS2 provide only truthful information was stressed to CS2 at the beginning of CS2's cooperation.

The following information was provided by CS2 to investigators from late 2020 into 2021 during face-to-face and telephonic meetings:

a. CS2 knows Corey ADKINS, Jimmy GADSON, Nicholas OSTHEIMER, and others to be associates with significant involvement in the distribution of heroin/fentanyl and crack cocaine.

b. CS2 informed investigators that GADSON was living at a residence on Sherman Avenue (i.e., the **SHERMAN AVENUE LOCATION**) since June 2020 and used that location as a narcotics distribution point. Investigators conducting physical surveillance during this investigation have observed GADSON at 596 Sherman Avenue. Furthermore, physical and electronic surveillance has routinely revealed unknown persons making short-duration visits to that location which, based on my training and experience, are indicative of narcotics transactions.

c. CS2 provided information that OSTHEIMER utilizes social media applications, specifically SnapChat, to further narcotics-trafficking activity. Law enforcement officers involved in this investigation have conducted multiple controlled narcotics purchases from OSTHEIMER and others using CS2 whereby SnapChat was used to facilitate the transactions.

d. CS2 was aware that OSTHEIMER and London PINKINS associate with narcotics traffickers from New Castle, PA.

e. CS2 has also conducted a controlled purchase of narcotics from GADSON in the past.

f.  CS2 is aware that London PINKINS utilized Deserae SLOAN and Jasmine MAYBEE to act as narcotics couriers for the receipt of narcotics in Detroit, MI, and subsequent transportation back to Pennsylvania. CS2 stated that historically PINKINS has made efforts to use different narcotics couriers. Recently, however, CS2 knows SLOAN and MAYBEE to have made multiple trips on behalf of PINKINS, including on April 20, 2021.

g.  In April 2021, CS2 observed MAYBEE on FaceTime, a video calling feature available on Apple phones, bragging about her involvement in making trips to Detroit, MI, and bringing back narcotics, to include cocaine and heroin. SLOAN and MAYBEE are also responsible for the distribution of narcotics upon their return as a means of producing additional profit. CS2 stated that SLOAN may be in possession of an otherwise legally owned firearm. CS2 knows that MAYBEE is paid $500 for each trip.

### 3.  Confidential Source 3

Case agents for this investigation have been in direct, personal contact with a cooperating source, referred to herein as "CS3," in recent months.  The case agents believe the information provided by CS3 has been reliable and credible because, as demonstrated herein, much of CS3's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS3's control.  To the extent case agents have concern about CS3's cooperation, it is that CS3 has not provided information as promptly as possible after receiving it and that CS3 may still be engaging in drug crimes.

The case agents have had discussions with CS3 for several months about CS3's knowledge of ongoing criminal activity in Western Pennsylvania, including the narcotics-trafficking activities of Forrest GILMORE. It should be emphasized that CS3 is not an anonymous source. The agents' interaction with CS3 has been in-person, as well as by telephone, and CS3 is fully aware that the agents know who CS3 is. The requirement that CS3 provide only truthful information has been stressed to CS3. CS3 has a criminal record that includes several adult convictions, including for drug and theft crimes. It is likely that CS3 is motivated to cooperate by a hope that the cooperation will help CS3 out regarding pending or potential criminal charges.

During discussions with CS3, the following information was provided to agents during face-to-face and telephonic meetings:

    a.  CS3 stated that GILMORE is very cautious to avoid detection by law enforcement and typically communicates with CS3 via FaceTime.

    b.  CS3 stated that GILMORE distributes ounce-level quantities of crack cocaine to customers in the New Castle, PA, area. In mid-June 2020, under the direction of the Lawrence County Drug Task Force, CS3 conducted a controlled purchase of approximately one ounce of crack cocaine from GILMORE in New Castle, PA.

    c.  CS3 was able to identify GILMORE and Daquan DUKES through DMV photographs and through social media applications (SnapChat and Facebook). GILMORE has provided CS3 with multiple telephone numbers.

    d.  GILMORE maintains multiple narcotics sources of supply, some of whom are local and some are in Western New York.

    e.  GILMORE sells crack cocaine for approximately $2,800/oz and will utilize younger members of the DTO to distribute gram quantities of crack cocaine to end-level narcotics users.

    f.  GILMORE uses his mother's residence located at 302 East Home Street, New Castle, PA (i.e., the **HOME STREET LOCATION**), to store narcotics and firearms.

    g.  CS3 has provided investigators with the social media accounts utilized by members of the DTO.

### 4.    Confidential Source 4

Confidential Source 4 ("CS4") has been cooperating with law enforcement officers involved in this investigation since November of 2020. CS4 is motivated by the potential to receive monetary compensation. CS4 was previously convicted of drug-trafficking and gun crimes.  CS4 is familiar with Jimmy GADSON and other members of his drug trafficking organization/DTO. CS4 has provided historical and current information on GADSON and his co-conspirators. CS4 has direct access to the cellular telephone numbers used by members of the DTO, as these members have consistently provided CS4 with those numbers in the past.

Case agents believe CS4 to be reliable and credible because, as demonstrated herein, much of CS4's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS4's control.  CS4 is not an anonymous source.  Agents' interactions with CS4 have been in-person and CS4 was fully

aware that the agents knew CS4's identity.  The requirement that CS4 provide only truthful information was stressed to CS4 at the beginning of CS4's cooperation.

During discussions with CS4, the following information was provided to agents during face-to-face and telephonic meetings:

> h.  CS4 knows GADSON is trafficking large quantities of narcotics to include crack cocaine and heroin/fentanyl.
>
> i.  CS4 knows GADSON utilizes 596 Sherman Avenue in Sharon, PA (the **SHERMAN AVENUE LOCATION**), to distribute/stash narcotics.
>
> j.  CS4 has conducted a controlled purchase of narcotics from GADSON.

### 5.    Confidential Source 5

Confidential Source 5 ("CS5") has been cooperating with law enforcement officers involved in this investigation since November 2020. CS5 was originally motivated to improve CS5's situation regarding criminal charges but is now cooperating for monetary compensation. CS5 was previously convicted of committing violent crimes. CS5 is familiar with Jimmy GADSON, London PINKINS, and other members of their DTO.  CS5 has provided historical and current information on GADSON, PINKINS, and their co-conspirators. CS5 has direct access to the cellular telephone numbers used by members of the DTO as these members have consistently provided CS5 with those numbers in the past.

Case agents believe CS5 to be reliable and credible because, as demonstrated herein, much of CS5's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS5's control.  CS5 is not an anonymous source.  Agents' interactions with CS5 have been in-person and CS5 was fully

aware that the agents knew CS5's identity.  The requirement that CS5 provide only truthful information was stressed to CS5 at the beginning of CS5's cooperation.

During discussions with CS5, the following information was provided to agents during face-to-face and telephonic meetings:

k.  CS5 advised law enforcement that a black male, known only to CS5 as "Shabba," (since identified as Albert CUMMINGS through, among other things, pole camera surveillance, review of a public record photo, and information provided by CS5) supplies London PINKINS and GADSON with large quantities of heroin/fentanyl. CS5 stated that Shabba is coming from Cleveland, OH, with large quantities of heroin/fentanyl. CS5 further advised that Shabba drives a red Lexus sedan that has an aftermarket wrap on it.

l.  When Shabba travels to Pennsylvania, he will often go to Sherman Avenue in Sharon (i.e., the **SHERMAN AVENUE LOCATION**) with the narcotics and typically will stay for a day or two.

m. Law enforcement officers have corroborated this information via physical and electronic surveillance in the area of 596 Sherman Avenue, Sharon, PA. This location is known to be used by London PINKINS, GADSON, and other members of the DTO to distribute narcotics from. On February 1, 2021, while conducting physical surveillance on 596 Sherman Avenue, law enforcement officers observed a red Lexus sedan, bearing Ohio registration HZK-1261. The vehicle was parked directly

across from 596 Sherman Avenue, Sharon, PA (i.e., the **SHERMAN AVENUE LOCATION**).

n.   On February 2, 2021, while conducting mobile and electronic surveillance near 596 Sherman Avenue (i.e., the **SHERMAN AVENUE LOCATION**), law enforcement officers observed a tall black male, matching Albert CUMMINGS's now-known physical appearance, exit from 596 Sherman Avenue and walk toward the red Lexus, which was now parked directly in front of 596 Sherman Avenue. The male unlocked the Lexus and appeared to retrieve something from the driver's area. The male then walked across Sherman Avenue and out of view of officers.

o.   Approximately an hour after officers observed the tall male retrieve an item from the red Lexus, officers observed the same male entering the red Lexus and driving away from Sherman Avenue.

**6**.     **Confidential Source 6**

Since November of 2020, case agents for this investigation have been in direct, personal contact with a cooperating source referred to herein as "CS6." The case agents believe CS6 to be reliable and credible because, as demonstrated herein, much of CS6's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS6's control.  The case agents have had multiple in-person discussions with CS6 about CS6's knowledge of ongoing criminal activity in Western Pennsylvania, including the narcotics trafficking activities of members of the DTO.

CS6 is not an anonymous source.  The agents' interactions with CS6 have been in-person and CS6 was fully aware that the agents knew CS6's identity.  CS6 agreed to cooperate with law enforcement in this investigation and others for monetary compensation.  The requirement that CS6 provide only truthful information was stressed to CS6 at the beginning of CS6's cooperation. CS6 was previously convicted of retail theft.

The following information was provided by CS6 to investigators since the beginning of March 2021 during face-to-face and telephonic meetings:

a. CS6 has provided detailed information about drug traffickers (including Rayjzon SAMS, London PINKINS, Jimmy GADSON, and other narcotics traffickers unrelated to this investigation), including quantities, methods of distribution, and source of supply, which was thereafter confirmed to be true by first-hand observations of law enforcement officers and the seizures of drugs.

b. CS6 informed investigators that SAMS is from New Castle, PA (Lawrence County).

c. CS6 was aware that SAMS associates with Jimmy GADSON from Farrell, PA, and with Forrest GILMORE's narcotics traffickers from New Castle, PA.

d. CS6 identified an official state photograph of SAMS (absent biographical information) as a photo of SAMS.  Furthermore, during a 2021 controlled purchase of crack cocaine by CS6 from SAMS, agents were able to identify an individual matching the description of SAMS as the person who conducted the narcotics transaction with CS6.

**C.      Certain Crimes of GILMORE, PINKINS, and GADSON**

On August 6, 2020, agents received information from CS3 that Forrest GILMORE was in Buffalo, NY, obtaining crack cocaine from Jerell WEATHERSBY. CS3 explained that GILMORE was coordinating the transportation of crack cocaine from Buffalo, NY, to New Castle, PA, with Dantavious NOAH. Agents obtained a detailed description of a rental vehicle that NOAH would be traveling in and using to transport the crack cocaine. The information was then provided to a Trooper with the Pennsylvania State Police ("PSP"), who established a stationary position on I-79 that the rental vehicle would likely pass by on the way back to New Castle from Buffalo.

PSP eventually observed the described vehicle traveling south on I-79 in a manner that violated the Pennsylvania Vehicle Code. PSP then attempted to conduct a traffic stop on the vehicle. It appeared that the vehicle would pull over and would stop, but the driver abruptly turned back onto I-79 and fled, leading PSP on a high-speed pursuit in excess of 120 mph. PSP pursued the vehicle for a while before terminating the pursuit due to the reckless and dangerous manner in which the vehicle was being driven. PSP thereafter observed the vehicle traveling in the direction of New Castle, PA, on Route 208.

PSP promptly contacted DEA and explained what occurred and continued to look for the suspect vehicle. DEA responded to assist that day and thereafter located NOAH walking in a fast-paced manner toward an apartment located in the Westview Terrace Housing Complex in New Castle, PA. DEA continued to investigate the incident and found that the suspect rental vehicle was returned to the rental company the day after the pursuit.

PSP advised DEA that, on the evening of the pursuit, a PSP Trooper encountered a vehicle traveling slowly in the area where the pursuit was terminated on Route 208. PSP

advised that, due to the slow operation of the vehicle, PSP made the decision to investigate. PSP advised DEA that the vehicle was occupied by Daquan DUKES and a female. DUKES and the female told PSP that an obituary flyer had flown out the window of their vehicle and they were attempting to locate it.

During and after the pursuit, agents were in direct contact with CS3. CS3 stated that NOAH, an adult female, and an unknown relative of WEATHERSBY were involved in a pursuit with PSP. CS3 stated that, during the pursuit, the occupants of the vehicle discarded approximately 13 ounces of cocaine from the vehicle somewhere in the area of Route 208. The following day, DEA and PSP coordinated a search of that area in an attempt to locate the discarded cocaine, but were unable to find anything.

In the first week of October 2020, CS3 stated that Forrest GILMORE traveled with "LP" (i.e., London PINKINS) to Buffalo, NY, to re-supply their cocaine product from their source of supply, Jerell WEATHERSBY. CS3 stated that CS3 observed through GILMORE'S social network (Snapchat, which is installed on GILMORE's cellular phone) that GILMORE was in Buffalo, NY, with PINKINS and meeting with WEATHERSBY on the evening prior. CS3 stated that GILMORE posted a video of GILMORE operating a blue rental car while riding through the streets of Buffalo, NY. CS3 also stated that WEATHERSBY was on GILMORE's snapchat videos, brandishing a stack of $100.00 bills (suspected drug proceeds). Subsequent Snapchat communications between CS3 and GILMORE indicated that GILMORE and PINKINS each were in possession of a half kilogram of cocaine. CS3 stated GILMORE was bragging about the half kilogram that he (GILMORE) had and the other half kilogram of cocaine that PINKINS was holding. CS3

stated he/she observed the cocaine packaged in a block form and wrapped in aluminum foil.

On November 6, 2020, the Farrell Police Department ("FPD") was dispatched by Mercer County 911 to the area of Hamilton Street, Farrell, PA, for reports of shots fired involving two individuals shooting at each other.  After officers from FPD arrived on scene, the mother of a victim began advising officers that "they" were shooting at her son. Officers asked who she was referring to as "they," and she stated London PINKINS and Jimmy GADSON.

The mother further stated that PINKINS and GADSON had been threatening her son all day over a posted picture on the social media platform SnapChat. The mother informed FPD officers that the SnapChat post was a picture of an affidavit from a previous crime committed in Farrell, PA.  Included in the affidavit was information naming her son as the individual who identified a suspect in a previous crime. The mother then stated to FPD officers that everyone now thinks her son is a "snitch." Previously on the same day in Farrell, the mother observed PINKINS and GADSON in a large tan-colored SUV. Subsequent law enforcement review of video surveillance cameras in the area of the shooting captured a tan SUV leaving the area after gunshots were heard.

In early November 2020, CS3 stated that Forrest GILMORE was with Dontez GOOD at GILMORE'S sister's residence on Pollock Avenue, New Castle, PA. CS3 relayed that GOOD was in New Castle, PA, from Tennessee, and filming a rap video. CS3 stated that CS3 observed GILMORE'S associates with guns, drugs, and stacks of money. CS3 stated that he/she observed GILMORE and GOOD selling heroin to multiple individuals while inside of GILMORE'S sister's apartment.

CS3 further stated that GILMORE explained to CS3 that GILMORE was now going to sell heroin, in addition to crack cocaine, and anticipated making more profit by doing so. CS3 stated that, according to GILMORE, the cocaine and crack cocaine sales have slowed do to the rising prices, and GILMORE believes that heroin sales will make up for the loss in cocaine sales. GILMORE further informed CS3 that he travels to Nashville, TN, to distribute large quantities of heroin to GOOD in the Nashville, TN, area.

In late February 2021, CS3 provided information that GILMORE and Rayjzon SAMS traveled to Buffalo, NY, and were with WEATHERSBY.  CS3 stated GILMORE introduced SAMS to his source of supply approximately 2 months ago. CS3 relayed that GILMORE, SAMS, or a designated associate of theirs, travel to Buffalo, NY, and return to New Castle, PA, with kilo quantities of cocaine.

On March 12, 2021, CS3 stated that GILMORE, SAMS, and their associates were all at GILMORE's mother's residence/the **HOME STREET LOCATION** with an extremely large amount of money.  Investigators monitored pole camera electronic surveillance of the **HOME STREET LOCATION**.  While monitoring the **HOME STREET LOCATION**, investigators observed GILMORE, SAMS, and other associates gathered outside of the residence and entering/exiting the back door several times.

### D.    Controlled Purchase of Crack Cocaine from London PINKINS

Since at least January 2021, London PINKINS has used a cell phone with number 724-301-3919, referred to herein as TT1, to distribute narcotics on a nearly daily basis. One of the ways this has been confirmed is via CS1.  CS1 stated that TT1 is PINKINS's number and identified an official state photograph of PINKINS (absent biographical information) as a photo of PINKINS/the user of TT1.  Furthermore, during a 2021

33

controlled purchase of crack from PINKINS that was arranged via TT1 (detailed below), agents were able to identify PINKINS as the person who conducted the crack deal with CS1.

During the fourth week of January 2021, law enforcement officers involved in this investigation met with CS1 at a neutral location to conduct a controlled purchase of narcotics from PINKINS. Law enforcement officers then directed CS1 to make a telephone call to TT1. The call from CS1 to TT1 was recorded and simultaneously overheard by one of the officers.  Shortly after placing the call, a male voice answered TT1 which was later identified by CS1 as PINKINS. During the call, CS1 asked PINKINS for a quantity of cocaine, ("You think I can grab a quarter or a halfy?"). PINKINS immediately responded to CS1 asking if he/she wanted cocaine or crack cocaine, ("the hard or soft?"). The conversation continued with CS1 responding to PINKINS that they wanted crack cocaine, ("The hard"). PINKINS then directed CS1 to a location in Sharon, PA.

Shortly after the call ended, CS1 received an incoming text message from PINKINS on TT1 asking CS1 how long until they would be at the meeting location, ("How long til u here"). CS1 responded they would be arriving soon, ("Bouta pull up"), and PINKINS on TT1 responded affirmatively, ("Ok"). It should be noted that the communications setting up the deal that are included herein occurred in the presence of law enforcement officers who confirmed CS1 was, in fact, communicating with TT1 because the officers observed the number for TT1 on CS1's phone as the calls/texts were made/sent/received or shortly thereafter.

Law enforcement officers searched CS1 for money, weapons, and contraband with negative results. CS1was then provided with official funds to be used during the controlled

purchase. Shortly thereafter, CS1 and an undercover law enforcement officer traveled to the location in Sharon, PA, where CS1 was to meet PINKINS. CS1 was also followed to that location by law enforcement officers who observed CS1 along the way.

Prior to the controlled purchase, investigators established static and mobile surveillance around the area where the meeting was to take place between CS1 and PINKINS. CS1 and the undercover officer arrived at the meet location and parked next to a red sedan bearing out-of-state registration 4EK1668. CS1 and the undercover officer immediately observed an individual matching the description of PINKINS in the passenger seat of the red sedan. CS1 then exited the vehicle and entered the rear passenger seat of the red sedan, sitting directly behind PINKINS. Less than two minutes later, CS1 exited the rear passenger seat of the red sedan and re-entered the vehicle with the undercover officer. The undercover officer and CS1 then departed the area, traveling directly back to the predetermined neutral site.

Upon arriving back to the predetermined neutral site, CS1 provided law enforcement officers with the suspected crack cocaine. CS1 was searched again for money, weapons, and contraband with negative results. CS1 was then debriefed by law enforcement officers. In addition to explaining how the transaction occurred as noted above, CS1 positively identified an official state photograph of PINKINS, absent biographical information, as the seller of the suspected crack. After seizing the purchased crack cocaine, case agents conducted a field test using a NIK Cocaine Swipe that reacted positively to the presence of a controlled substance. The seized narcotics were sent to the DEA Laboratory for analysis.

### E.    Communications Intercepted over TT1

35

On March 12, 2021, judicial authorization was received to intercept wire communications over TT1.  On April 7, 2021, judicial authorization was received to intercept electronic communications over TT1 and to continue to intercept wire communications over TT1.  Subsequent judicial orders extended the authorization period into late June 2021.  Unless stated otherwise, all of the intercepted London PINKINS communications reproduced herein were intercepted over TT1.

The communications intercepted over TT1 have established, among other things, that London PINKINS is distributing narcotics on a nearly basis in Mercer County, Pennsylvania, and that he is storing and distributing the narcotics, along with his co-conspirators, at the **EUCLID AVENUE LOCATION**, the **WOODROW COURT LOCATION**, the **CATHEDRAL DRIVE LOCATION**, and the **ORANGE DRIVE LOCATION,** as well as at other locations in the Sharon/Farrell, PA area.  For example, on March 23, 2021, a female with number 724-979-2388 called London PINKINS.  She asked if he would supply heroin/fentanyl to her: "Can I come through for some boy?"

PINKINS agreed to supply the female customer and asked how much heroin/fentanyl she wanted: "Yeah, what you had wanted?"  The female told PINKINS the amount of heroin/fentanyl she wanted: "I need a half a boy."  PINKINS told her that he would meet her to do the deal in about 30 minutes: "yeah, you got to give me like, 30, like 30 minutes."  The female then told PINKINS to text her when he was ready to do the deal: "Ok, babe. Well just hit me up, this is my number, just text me whenever it's good." PINKINS agreed: "Alright, I got you."

Drug dealing communications between London PINKINS, who was using TT1, and his uncle, Quinton PINKINS, who was using number 724-301-5484/TT4, were

intercepted on multiple occasions in March and April 2021. All references to Quinton PINKINS herein will include his first name to distinguish him from London PINKINS. In addition to being the uncle of London PINKINS, Quinton PINKINS is a drug dealer in the Mercer/Lawrence County area who resides at, and deals drugs from, the **LEE AVENUE LOCATION**, as established below.

During a call on March 18, 2021, London PINKINS told Quinton PINKINS that he (i.e., London PINKINS) had been re-supplied with drugs: "I forgot to call and tell you the other day to you know I'm back ta everything everything."  Quinton PINKINS thereafter told London PINKINS that he (i.e., Quinton PINKINS) had just went to Youngstown, Ohio, to get re-supplied with drugs: "I just went bro me and my landlord bro we just left the Yo, I swear to god bro, I just came back with 2 bro. . . . My shit clinking bro I got the best food in the city you feel me. Like I got a damn hundred grams of it. I'm in grind mode."

During another call between them on March 28, 2021, Quinton PINKINS told London PINKINS that he was somewhere a significant distance away with a drug supplier who had a large quantity of fentanyl: "He got a whole thing of some fet bro. you feel me?" London PINKINS responded by asking what the supplier would charge for a full kilogram of the fentanyl: "What they want for a whole joint?"  Quinton PINKINS answered by stating the price the drug supplier would likely charge: "Oh, I can probably get you one bro. It's, it's, it's..... They, they he chargin basically want um, thirteen you feel me." London PINKINS and Quinton PINKINS thereafter concluded their discussion without revealing who or where the supplier was or whether they had ordered or obtained fentanyl from the supplier.

On March 31, 2021, Quinton PINKINS called London PINKINS to inform London PINKINS that he (i.e., Quinton PINKINS) had returned to the Mercer/Lawrence County area from his trip to meet with the drug supplier.  Quinton PINKINS stated, "I'm back bro."  London PINKINS immediately replied, "Where you at? I'm bout to pull up on you" – asking where specifically Quinton PINKINS was at so that London PINKINS could meet with him to discuss the drug supply/supplier.  Quinton PINKINS answered, "Shit I'm at the crib (i.e., the **LEE AVENUE LOCATION**), I told you what I was going to do. I tried to tell you, but, that shit there, bro" – continuing to express an interest in making a deal with the drug supplier and indicating that he had not made a deal as of that time.

As noted above, CS2 has identified Deserae SLOAN and Jasmine MAYBEE as two of London PINKINS's narcotics couriers for the receipt of narcotics in Detroit, MI, and subsequent transportation back to Pennsylvania.  On March 16, 2021, at approximately 4:35 pm, SLOAN, using telephone number 724-877-2416, made an outgoing call to London PINKINS. During the initial stages of the communication, PINKINS asked SLOAN, "What you got planned for the day?" SLOAN replied that her schedule was open, "Uh, nothing that. I, I don't know. I don't think nothing." PINKINS then asked if she wanted to make some money, "You tryin uhm, you trying to make some bread yet", to which SLOAN asked, "What you need me to do?" PINKINS then informed SLOAN that he needed her to go to Detroit, "Shit. Need you to go to the city," to which she replied affirmatively, "Okay." PINKINS then asks, "I'm sayin'. Is you gonna be ready?" SLOAN replies, "I should," then goes on to ask if MAYBEE can make the trip with her, "Uh, could Jasmine come with me cause I was supposed to hang out with her?" PINKINS responds, "Yeah, hell yeah, she can come."

Later that same day, at approximately 6:54 pm, SLOAN makes another outgoing call to PINKINS informing him that she is just leaving work, "Yo I just got off," and asking, "where do I got to go?" After telling SLOAN to call him once she gets home, SLOAN responds, "Alright, and what's the city?", to which PINKINS states, "the D", meaning Detroit, MI.

Based on my training, knowledge, and experience, I believe London PINKINS was requesting SLOAN to drive to Detroit, MI, for the purpose of receiving narcotics and transporting them back to Pennsylvania for PINKINS.  I believe PINKINS chose SLOAN to reduce law enforcement suspicion related to the transfer of narcotics from Detroit, MI, to Pennsylvania. Furthermore, I believe PINKINS intended to use SLOAN to distance himself from the inherent risks of transporting bulk narcotics across state lines. I also believe SLOAN requested MAYBEE join her on the trip due to the risk involved and because of the ultimate travel time that would exceed seven hours.

About one month later, on April 17, 2021, at approximately 6:20 pm, an outgoing text from London PINKINS to Quinton PINKINS was intercepted, "Omw", indicating that London PINKINS was headed to Quinton PINKINS's residence in Mercer County (the **LEE AVENUE LOCATION**). Immediately following the text message, London PINKINS sent another text message informing Quinton PINKINS, "I already got a driver". At approximately 6:28 pm, London PINKINS texted Quinton PINKINS that he was at the residence, "Here".

At the same time, pole camera surveillance in the area of the **LEE AVENUE LOCATION** (i.e., Quinton PINKINS's residence) revealed a dark colored Chevy sedan arrive and park in front of the residence. The surveillance captured the vehicle bearing (PA)

registration LNS-0445.  The vehicle is registered to Jasmine MAYBEE, 896 N Sharpsville Ave, Sharon, PA. London PINKINS was observed exiting the rear driver side of the vehicle and walking to the porch of the **LEE AVENUE LOCATION.**  The door to the residence opens and London PINKINS enters. Shortly thereafter, London PINKINS exits the residence and re-enters the Chevy sedan before it departs the location. Based on my training and experience, I believe London PINKINS met with Quinton PINKINS for the purpose of conducting a narcotics transaction at the **LEE AVENUE LOCATION** and was utilizing MAYBEE as his driver to reduce law enforcement scrutiny and risk.

The following day, April 18, at approximately 1:20 pm, London PINKINS called Quinton PINKINS. During the intercepted call, Quinton PINKINS states that he's with MAYBEE, "I'm with Jazz," and that, "We had to go get the car cleaned out, we can't ride like this. We got this bitch spotless you feel me?" London PINKINS responds, "what y'all about to do?", and Quinton PINKINS responds, "They about to drop me off they gave me a ride to go hit my play," meaning MAYBEE and another person were providing transportation to Quinton PINKINS while he conducted a narcotics transaction. Quinton PINKINS then informs London PINKINS that, "they bout to get ready to shake somewhere," as in MAYBEE and the other person were preparing to travel.

Based on my training, knowledge, and experience, I believe Quinton PINKINS was utilizing MAYBEE and SLOAN for transportation for his narcotics transactions. Furthermore, I believe Quinton PINKINS was making sure the vehicle SLOAN and MAYBEE were operating was clean so as not to increase law enforcement suspicion of criminal activity, "we can't ride like this," should an interaction with law enforcement occur. I believe the vehicle was in the process of being prepared for another out-of-state

narcotics re-supply, whereby MAYBEE and SLOAN would be operating the vehicle. As discussed above, CS2 indicated that SLOAN and MAYBEE last traveled to Detroit, MI, on April 20th, 2021, for the purpose of a narcotics pick up.

On April 26, 2021, Keith WILDER, using telephone number 724-734-9595 (identified through pole camera surveillance, case agent pre-existing familiarity with his appearance, and the content of intercepted communications), called London PINKINS and asked PINKINS, "Where you at?" PINKINS provided his location in Sharon, PA, "I'm over here on West Hill," and WILDER asks if it is the location on A Street in Sharon, "What is it 'A'?" PINKINS responds that he will send a text message with the specific address he is currently located at, "Yeah I'm about to text it to you." Less than one minute after the call ends, PINKINS sent a text message to WILDER stating "543 a street". WILDER then responds via text message stating he is on his way, "Omw". Based on my training, experience, and the results of the investigation so far, I believe WILDER was contacting PINKINS for the purpose of meeting to conduct a drug transaction with PINKINS, and PINKINS sent WILDER the address where the drug transaction would occur.

Later that same day, WILDER called PINKINS and asked if PINKINS was still located at the same place, "Yo, when you, still over that way?" to which PINKINS responded, "Yeah." WILDER then informed PINKINS that he (i.e., WILDER) had a quantity of narcotics, "Oh I might have three of those things." WILDER then asked PINKINS to send someone to conduct a narcotics exchange, "What's your, one of your boys over here to bring one, one of them things and I'll - I got, I have, I might have three of them things. Got money to spare." After confirming that WILDER was at home,

41

PINKINS stated, "Alright they about to come now." Based on my training, experience, and the results of the investigation so far, I believe WILDER was trading prescription pills for heroin/fentanyl and/or cocaine/crack from PINKINS. WILDER emphasized that he had money to spare in an apparent effort to have PINKINS add an additional quantity of narcotics.

On May 1, 2021, London PINKINS and WILDER once again exchanged a series of wire and electronic communications setting up a drug deal. WILDER texted PINKINS "Hey can you come see me" – asking if PINKINS was willing to meet to supply drugs to WILDER. PINKINS agreed by texting to WILDER "I'm on a street come over here" – informing WILDER where to meet PINKINS to do the deal. WILDER replied with the text "Okay" – informing PINKINS that he would meet PINKINS at that location to do the deal.

Thereafter that day a call was intercepted between London PINKINS and WILDER confirming that the drug deal had occurred and WILDER was concerned with the condition of the drugs that PINKINS supplied to him. During the beginning of the brief call, WILDER stated, "Oh man I didn't know it was all broke up like that" – expressing concern about the condition of the drugs PINKINS supplied to him. London PINKINS asked, "What?" – attempting to determine what WILDER was referring to. WILDER answered, "What you gave me" – specifying that he was referring to the drugs that PINKINS had just supplied to him. Thereafter, PINKINS agreed to replace the drugs he just supplied to WILDER with more drugs that he was about to process – "Oh yeah that's his last I'm about to do some more now, I mean if you want me to I"ll I'll trade you out in it don't matter." WILDER agreed to trade the drugs he received from PINKINS for the drugs PINKINS was

about to process – "Yeahhh, I'll sit on it man yeah cause I don't yeah I'll wait for you to a yeah I won't even mess wid it."

On May 11, 2021, London PINKINS exchanged communications with a male who was utilizing telephone number 724-979-2846, referred to herein as "UM2846."  The purpose of the communications was to set up a narcotics transaction. During a voice call that occurred, UM2846 called PINKINS to ask if he could deliver $50 worth of narcotics, "Can you bring me a fifty piece?". PINKINS responded, "Where you at?", to which UM2846 provided his exact location, "I'm down on Willow, on Budd Street. The one little parking lot on Budd."  PINKINS then told UM2846, "Text me the address bro," and UM2846 agreed, "Alright, I'll text it to you."

Approximately two minutes after this voice call, UM2846 texted the address of his location to PINKINS, "172 W Budd St…apt 2". After about 15 minutes, UM2846 again texted PINKINS asking where PINKINS was, "Wya". PINKINS immediately texted back stating that he was on his way, "Omw". The text communications continued and UM2846 asked PINKINS, "You close…I'm going outside on bench". Aggravated that PINKINS was taking so long, UM2846 texted PINKINS again to inform him that UM2846 could purchase the narcotics from multiple other suppliers in the surrounding area, "Did u know I can get anywhere in sharon Hermitage farrell..n surrounding areas in a half hour...so where you at bro".

UM2846 then again called PINKINS and the two argued about the amount of time it was taking to conduct the narcotics transaction. PINKINS expressed frustration over the fact that UM2846 was not giving him enough time, "What up bro, I'm on my way you don't give a chance to get there. You be rushing me, you might as well call me an hour before."

UM2846 responded that it had already been 30 minutes since the request was made, "Listen, I'm not trying to rush you but it's been a half hour." PINKINS explained that he's waiting for his ride, "Ok, bruh I just told you I got to call a ride and get a ride." UM2846 apologized making a remark that he's used to faster service, "Alright, I'm sorry about that. You know I'm use to you know." PINKINS then instructs UM2846 to call earlier for future narcotics transaction so he can be ready, "You be needing me and want me to rush, you need to call me an hour ahead of time so I know."

On May 12, 2021, PINKINS made a call to 724-734-9058 which is used by Kenneth MILLER as confirmed by, among other things, references to MILLER and/or his nickname and/or his specific street address (i.e., the **CATHEDRAL DRIVE LOCATION**) in intercepted calls directly related to this phone number.  The purpose of this May 12 call was to discuss using MILLER's residence/the **CATHEDRAL DRIVE LOCATION** to cook crack cocaine. During the conversation that ensued, PINKINS informed MILLER, "I'm bout to come through," and MILLER asked, "For what?". PINKINS responds, "Man you know what for, bruh. You know ever time I call you what I need you for, stop actin' stupid." After playful arguing ensues, PINKINS again asks if MILLER is home, "Aight, well you at the crib?", and MILLER responds affirmatively, "I'm here mother fucker!"

On May 17, 2021, London PINKINS used TT1 to call a male, who was using number 724-971-0232 and who is referred to herein as UM0232, to set up a drug deal. PINKINS informed the male that he (i.e., PINKINS) had just landed at the Cleveland Airport and, as a result, was not available at that moment in time to do the deal – "Yeah I ahh, I'm, I'm about to ahh, get off the plane now. This shit jus' landed in Cleveland." UM0232 expressed some disappointment – "Ah, shit, aight. Shit, you won't drive no hour

away would you?"  Shortly thereafter, PINKINS informed UM0232 that PINKINS would be back to Mercer County, Pennsylvania, and ready to do the drug deal in less than one hour – "Ahh, I'm about to shoot right back, right to the spot though. Be ready in less than an hour."  This statement satisfied UM0232 – "Aight bet."

Also on May 17, 2021, London PINKINS used TT1 to set up another drug deal with Jammar SHELTON through a series of text messages.  SHELTON texted "Wya" to PINKINS asking PINKINS where he was at.  PINKINS replied with the text message "67 Euclid" informing SHELTON of the location for the drug deal (i.e., the **EUCLID AVENUE LOCATION**).  SHELTON then sent the text message "Bet", acknowledging the location of the drug deal, and then sent the text message "Lucky number 7 lol", informing PINKINS of the quantity of drugs SHELTON wanted to acquire.

Additional communications intercepted over TT1 during the week of May 17, 2021, demonstrate that London PINKINS is continuing to use Kenneth MILLER's residence/the **CATHEDRAL DRIVE LOCATION** to cook crack cocaine with MILLER's consent. During a short call on May 18, PINKINS told MILLER "I need to use the kitchen, bro" – informing MILLER that PINKINS wanted to use the kitchen in MILLER's residence to cook crack cocaine.  MILLER then told PINKINS "I ain't home!" and "you gotta wait 'till I come home" – informing PINKINS that he could cook crack cocaine at MILLER's residence when MILLER got home.

Later that day, PINKINS and MILLER had another call during which MILLER told PINKINS "I'm, I'm round the corner. I'll be home by the time you get here" – informing PINKINS that he could travel to the **CATHEDRAL DRIVE LOCATION** at that time to start cooking crack cocaine.  PINKINS replied, "Aight, meet me there bruh. Turn the stove

on" – asking MILLER to meet PINKINS there and to turn the stove on so that it was ready to cook crack when PINKINS got there.

Two days later, on May 20, PINKINS sent the following text message to MILLER: "Need kitchen ASAP".  This text message further highlights PINKINS's continuing use of the **CATHEDRAL DRIVE LOCATION** to cook crack cocaine.  It also further highlights PINKINS's daily and ongoing drug trafficking for months/years now.

London PINKINS's communications intercepted over TT1 in June 2021 further highlight his daily and ongoing drug trafficking, along with his co-conspirators, at and from several of the search locations listed herein.  For example, on June 5, 2021, PINKINS received a call from a male using number 724-977-3441.  The content of the call, particularly in the context from another intercepted call also reproduced below, reveals that the male was distributing PINKINS's drugs at the **EUCLID AVENUE LOCATION**, and needed re-supplied with drugs that PINKINS just had at the **WOODROW COURT LOCATION,** which is the residence of PINKINS's mother.

This is the call between PINKINS and the male using the x3441 phone on June 5, 2021:

LP: Check that nigga, yo?

UM: Where you at?

LP: Just left mommy's? (i.e., the **WOODROW COURT LOCATION**)

UM: I'm tryin to come grab some, tryin, I aint got no work? You can just give me some work and I'll bring you the bread I just grab some more boi.

LP: You talkin' crazy, you should have Facetimed, lil bro. You, that's a number one rule is

dealin' with your big brother, bro. I'm in a major position. You can't talk, call my phone talkin hot like that.

UM: My bad.

LP: Yea.

       The call between PINKINS and the male using the x3441 phone that provides context for the June 5 call reproduced above occurred on June 2, 2021, and is reproduced below.  The June 2 call involved a male who was supposed to arrive at the **EUCLID AVENUE LOCATION** to buy drugs, but who had not arrived as of the time of the call. It should be noted that the reference in the June 2 call to "Jump crib" is a reference to the **EUCLID AVENUE LOCATION** where co-defendant Jeronte "Jump" ROBINSON resides and deals drugs for/with PINKINS and Nicholas OSTHEIMER and their other associates.

UM- hey ain't nobody at Jump crib?

LP- it's the little nigga ahh Dom he should be there.

UM- you said who

LP- he said he is about to pull up

UM- you said it's a little nigga who

LP- Huh

UM- you said he should be pulling up?

LP- yeh if he don't pull up in like three minutes then fuck it

UM- alright

LP- alright

      **F.**    **Controlled Purchase of Heroin/Fentanyl from GADSON via TT2**

Jimmy GADSON has been using a cell phone with number 912-281-7721, referred to herein as TT2, to deal drugs for months throughout 2021.  Agents have confirmed that TT2 is utilized by GADSON.  One of the ways this has been accomplished is via CS2 and CS4, both of whom have stated that TT2 is "Loco's" number ("Loco" is a well-known street name for GADSON) and identified an official state photograph of GADSON (absent biographical information) as a photo of GADSON/the user of TT2.  Furthermore, during a 2021 controlled purchase of heroin/fentanyl by CS4 from GADSON that was arranged via TT2 (detailed below), agents were able to identify an individual matching the description of GADSON as the person who conducted the narcotics transaction with CS4.

During the first week of February 2021, CS4 conducted a controlled purchase of heroin/fentanyl from GADSON.  This purchase was facilitated via the use of TT2. It should be noted that the communications setting up the deal that are included herein occurred in the presence of law enforcement officers who confirmed CS4 was, in fact, communicating with TT2 because the officers observed the number for TT2 on CS4's phone as the calls/texts were made/sent/received or shortly thereafter.

After meeting with CS4 at a predetermined location, agents overseeing this controlled purchase searched CS4 for money, weapons, and contraband with negative results. Agents then attempted a recorded call to TT2 from CS4 with negative results. TT2 thereafter was used to send a text to CS4 asking what quantity of heroin CS4 wanted, ("Nigga how much???"). CS4 responded via text message and requested a few grams of heroin/fentanyl, ("A few G's").

Shortly after the text exchange between CS4 and TT2, CS4 received an incoming call from TT2 which was not answered at that time.  Agents overseeing the controlled purchased observed the incoming number on CS4's phone and confirmed it to be TT2.

CS4 then placed a call back to TT2, that was simultaneously overheard by one of the agents, and a male voice answered. The call from CS4 to TT2 was recorded. CS4 identified the male voice on TT2 as "Loco." During the call, CS4 stated that he wanted to purchase narcotics from GADSON, ("You only do one thing"). GADSON then asked CS4 if he wanted two grams of heroin, ("Say 2?"). CS4 responded negatively, requesting four to five grams of heroin, ("No, give me 4 or 5"). GADSON replied that he was going to send a text message with the location for where to meet.  GADSON then texted the location to CS4 from TT2, ("Timberlane hermitage pa"). CS4 received another incoming text from TT2 asking CS4 to bring a scale to weigh the narcotics, ("Bring a scale to"). GADSON then provided the price of the narcotics as $400, ("Yeah you had it right and I need $400"). After another series of text messages, CS4 changed his/her request to six grams of heroin for $600, ("Make it 6 I got $600"). GADSON replied with the address for where to meet, ("3534 timberlane hermitage pa"), and confirmed he was ready for the transaction, ("Ite").

Agents then searched CS4 and CS4's vehicle for money, weapons, and contraband with negative results. CS4 was then provided with official funds to be used during the controlled purchase. Shortly thereafter, CS4 left the neutral site driving directly toward the meeting location.

Prior to the controlled purchase, investigators set up static and mobile surveillance in the area where the meeting was to take place. CS4 was observed by physical surveillance agents arriving at the meeting location. After CS4 arrived, a black male matching the

description of GADSON was observed exiting a separate residence in the area of the meeting location. GADSON was observed entering CS4's vehicle that was then driven around the block and returned to the original meeting area. GADSON was then observed exiting CS4's vehicle and walking toward the residence he previously exited from. CS4 departed and was followed back to the predetermined neutral site.

Upon arriving back at the predetermined neutral site, CS4 provided agents with the suspected heroin/fentanyl. CS4's vehicle and CS4 were searched again for money, weapons, and contraband with negative results. CS4 was then debriefed by agents.  In addition to explaining how the transaction occurred as noted above, CS4 positively identified GADSON as the person that sold CS4 the suspected narcotics inside CS4's vehicle. After seizing the purchased heroin/fentanyl, agents conducted a field test using a SIRCHIE Nark II heroin/fentanyl kit that reacted positively to the presence of a controlled substance. The heroin/fentanyl was sent to the DEA laboratory for analysis.

G.     **Communications Intercepted over TT2**

On March 12, 2021, judicial authorization was received to intercept wire and electronic communications over TT2/used by Jimmy GADSON.  Subsequent judicial orders extended the authorization period into late June 2021.  Unless stated otherwise, all of the intercepted GADSON communications reproduced herein were intercepted over TT2.

On March 24, 2021, one of Jimmy GADSON's regular customers, a male using number 724-877-0759 (subsequently identified as Michael LOVE through his local arrest in April 2021 and the content of intercepted communications), called GADSON and told GADSON that he was on his way to GADSON to obtain two quantities of two different

drugs: "I need a G of down and half a G up. Already passed Mercer. I'll be in 15 minutes the most."  GADSON agreed to do the deal and told the customer to call GADSON when the customer was close to GADSON: "A'ight, call me soon as you getting close."

About 12 minutes later, the male called GADSON and told him where he was and that he needed to get money out of the ATM before meeting GADSON: "I'm already here up. I'm up here by Sheetz. I just gotta run and grab some money at the ATM."  Eight minutes later, GADSON sent a text message directing the customer to the location where GADSON would supply the drugs to the customer: "I'm at the laundromat now".

The next day, March 25, GADSON exchanged wire and electronic communications with another regular customer to set up another drug deal.  The male customer, using number 724-931-5356 (subsequently identified as Aubrey GROSE through physical surveillance, case agent pre-existing familiarity with his appearance, and the content of intercepted communications), and GADSON exchanged text messages setting up a one gram drug deal at a Country Fair convenience store.  The customer texted, "Can you bring a gram out in the next hour?"  GADSON replied with the text "Omw to you now leaving down town now".  The customer responded with the text "Can you meet me a country fair?"  GADSON then confirmed the drug deal location with a follow-up call during which he asked, "You said to meet you at Country Fair now?"  The customer answered, "Yeah, if you can, I'm right by Country Fair. I'm going there. I gotta meet my dude there in like 20 minutes."  GADSON then concluded the call, and confirmed the location of the drug deal, with the statement "I'm comin up there now."

The next day, March 26, 2021, GADSON set up another drug deal with a male customer who uses number 724-418-8185 (subsequently identified as Brandon TAYLOR

through pole camera surveillance, case agent pre-existing familiarity with his appearance, and the content of intercepted communications).  The deal was set up with a rather explicit phone call during which the customer ordered two grams of drugs: "I need two grams." GADSON agreed to do the deal: "A'right."

On March 30, 2021, the male customer with the x0759 number discussed above called GADSON and told GADSON that he was on his way to GADSON – "Hello, I'm headed that way" – to obtain quantities of two drugs from GADSON – "Uh, one up, one down."  GADSON agreed to do the deal and told the male that he (i.e., GADSON) would text the address where they would meet to do the deal: "I'ma send you the address." GADSON then texted the address of the meeting location to the male: "596 Sherman Sharon pa" (i.e., the **SHERMAN AVENUE LOCATION**).

On April 26, 2021, GADSON received a text message from Aubrey GROSE who was still using the x5356 number identified above.  The text message from GROSE stated "You around?" and was sent for the purpose of determining if GADSON was available to supply GROSE with drugs.  GADSON replied with a text message confirming he was available – "Yeah".  GROSE thereafter sent GADSON text messages informing GADSON how much money GROSE had available to spend on drugs – "I have another 80 bucks or so left on my card. . . ." – and the quantity of drugs GROSE wanted to receive from GADSON – ". . . might just grab a quarter".  GADSON agreed to do the deal by sending this text message back to GROSE – " K... be there shortly".

Also on April 26, 2021, GADSON made a call to Michael LOVE who was still using the x0759 number identified above.  During the call, LOVE asked GADSON to supply him with a quantity of crack on credit in return for LOVE paying up front for a

quantity of heroin/fentanyl: "Do me a favor. Fucking, front me 50 of hard. I'll buy 40 of boy." GADSON refused to front the crack to LOVE at that time – "Not right now." LOVE then expressed his irritation about GADSON's refusal, despite all of the drug money LOVE produced for GADSON, by stating (apparently to someone who was with LOVE) – "He can't do it. Alright, I line this motherfucker's pocket all the time. He can't help me out?"

Drug dealing communications between GADSON and Quinton PINKINS, who was using TT4 as referenced above, were intercepted on multiple occasions in March and April 2021. On April 27, 2021, a series of text communications occurred between GADSON and Quinton PINKINS regarding a narcotics re-supply. Quinton PINKINS initially informed GADSON that he (i.e., Quinton PINKINS) had narcotics available for distribution, "It's on da flo". GADSON texts back, "You back???", to determine if Quinton PINKINS can meet with GADSON to supply GADSON. Quinton PINKINS responds, "Yea," confirming that he can meet to supply GADSON. GADSON then texts Quinton PINKINS that he's going to meet with him to be re-supplied, "Finna pull up". Approximately 25 minutes later, pole camera surveillance in the vicinity of Quinton PINKINS's residence (i.e., the **LEE AVENUE LOCATION**) reveals GADSON arriving at the residence and meeting with Quinton PINKINS.

Later the same day, GADSON called Quinton PINKINS to discuss another meeting for another drug deal between them. GADSON asked, "Hey, where the hell you at?" Quinton PINKINS answered that he was at home (i.e., the **LEE AVENUE LOCATION**), "Right here," and asked if GADSON was at another location, "You over Uncs?" GADSON responded that he was told to go there, "That's where he said to go," and Quinton PINKINS responded, "Yea, I'm about to be there." Quinton PINKINS further stated that he had to

get the drugs before they met, "Shit I had to go get right. I'm right here walk up to, I'm walking up to the, um, the corner by the center."

On May 3, 2021, GADSON and Aubrey GROSE, who was using his x5356 number, exchanged a series of calls and text messages setting up a drug deal. GROSE started the conversation off with a text message ordering up a quantity of drugs – "I want to grab a ball today when you have time". GADSON replied with a text message agreeing to promptly supply the drugs to GROSE – "K, be there in 15 minutes". Thereafter, GADSON called GROSE and had a short conversation with him. During the call, GROSE asked, "You're here?" – asking if GADSON had arrived at GROSE's residence to do the deal. GADSON confirmed that he had arrived by stating "Yeah." GROSE then stated, "Oh yeah, come on, just pull to the front. I'm coming right now" – informing GADSON that GROSE was about to come out of the residence to meet GADSON to do the deal.

On May 5, 2021, GADSON and Quinton PINKINS, who was still using TT4 at the time, exchanged multiple communications about Quinton PINKINS collecting money for an unidentified person he was planning on meeting with, likely to pay for a supply of drugs previously provided on credit and/or to pay for an additional supply of drugs. At approximately 10:21 a.m., Quinton PINKINS texted GADSON informing GADSON that he needed payment in preparation for the meeting, "Bra ima need something today my ppls on way n lmk". GADSON texted back affirmatively and asked if $1,000 was enough, "Bet, is a band cool for today". Quinton PINKINS confirmed via text that $1,000 was enough and assured GADSON that GADSON would not have to pay again until the next month, "Yeah n u want have to here from me no more til next month". Quinton PINKINS then

informed GADSON via text that he will reach out to GADSON around 2 p.m., "Ima hit u round 2".

At 1:59 p.m., GADSON texted Quinton PINKINS that he needed more time, "Give me a second waiting on my ppl". At approximately 4:35 p.m., Quinton PINKINS texted GADSON saying he gave GADSON more than enough time and that the people were about to arrive, "Yo bra gave u extra 3hours I counted that 1k n bra p ppl bout to b here". GADSON then responded to Quinton PINKINS that GADSON was getting ready to meet with him, "Omw to you". At 5:39 p.m., Quinton PINKINS again asked GADSON via text when he was going to arrive (at the **LEE AVENUE LOCATION**), "Bra how long my ppls here". Two minutes later GADSON responded via text indicating that he would meet up with Quinton PINKINS soon, "Leaving my crib now" (leaving the **SHERMAN AVENUE LOCATION**).

On May 8, 2021, GADSON used TT2 to set up a drug deal with Michael LOVE. During a call on that date, LOVE told GADSON "I need a ball of hard and a down. Ah fuck this, and a half of down" informing GADSON of the quantity of drugs he wanted GADSON to distribute to him.  GADSON replied, "A'ight. You close or what?" – agreeing to do the deal and asking where LOVE was at.  LOVE answered, "I will be" – informing GADSON that he would travel closer to GADSON to do the deal.  Shortly thereafter, LOVE sent a text message to GADSON stating "I need a whole G of down dick head" – increasing the amount of one kind of drug that he wanted GADSON to distribute to him.

On May 17, 2021, GADSON used TT2 to once again communicate with Michael LOVE to set up another drug deal.  LOVE called GADSON and informed GADSON that he wanted to acquire more crack cocaine from GADSON – "I need like a half of hard."

GADSON agreed to do the deal and informed LOVE that GADSON was going to send an associate to deliver the crack cocaine to LOVE – "well [yawns] I'm finnin' have my brother come up."  In return, LOVE confirmed his location – "I'm still right here."

Also on May 17, 2021, GADSON used TT2 to set up another drug deal with Aubrey GROSE through a series of text messages and voice calls.  The series included a text message from GROSE stating "You maybe feel like running me to sheetz for 160" – informing GADSON that GROSE could buy $160 of drugs from GADSON if GADSON drove GROSE to pick up the money.  GADSON thereafter called GROSE and told GROSE that he would be there to do the deal in ten minutes – "I'll be there in 10 minutes."  By 40 minutes later, GADSON still had not arrived to do the deal so GROSE called GADSON and asked "how close are you?".  GADSON answered, "I'm talkin' my brother is on his way. He should be there. He might be outside" – informing GROSE that GADSON sent an associate to complete the drug deal with GROSE.

On May 19, 2021, GADSON exchanged text messages with Aubrey GROSE revealing that GADSON was having an associate, who was not referred to by name, distribute drugs for him while GADSON was out of town.  GROSE sent a text message to TT2 stating "Ya I'm good" that was not preceded by any corresponding communication from or with GADSON.  GROSE then followed up with the text message "That wasnt for you. Your brother or whoever is on his way" – explaining that GROSE intended to send the text message to the person who was distributing for GADSON.  GADSON then replied with the text message "K, lmk when he's there or whenever he leaves" – asking GROSE to inform GADSON when GADSON's associate arrived to complete the deal.  GROSE

answered with the text message "He just left" – confirming that the unnamed associate completed the deal for GADSON.

Also on May 19, GADSON used to TT2 to set up another drug deal, this time with Ross SELIGA.  During the call with SELIGA, SELIGA asked, "Uh, I get a, a 4 boy and a 2 of work?" – asking if GADSON would distribute two quantities of drugs to SELIGA. GADSON asked SELIGA where he was – "Where you at, home?"  SELIGA confirmed that he was at home – "Yeah."  GADSON replied, "A'ight" – confirming that he would do the deal with SELIGA.

Intercepted communications over TT2 in June 2021 demonstrate that GADSON is still dealing drugs on a daily basis and is still using the **SHERMAN AVENUE LOCATION** to store drugs at and to deal drugs from.  For example, on June 11, 2021, a female customer using number 724-734-6294 called GADSON and asked if GADSON had a particular kind of narcotics in his possession – "you got that white stuff?"  GADSON confirmed that he did – "Yeah, yeah" – and that he had it at the **SHERMAN AVENUE LOCATION – "**I'm at the crib."

### H.    Communications Intercepted over TT4 and TT5

As previously detailed in this affidavit, multiple drug trafficking wire and electronic communications of Quinton Pinkins, who was using TT4 at the time, were intercepted in March 2021 and April 2021 over TT1/London PINKINS and TT2/Jimmy GADSON.  For the sake of efficiency, Quinton PINKINS's March and April communications will not be reproduced in this section.  Quinton PINKINS's communications in March and April, and thereafter via TT5 in May, demonstrate that he is supplying narcotics to London PINKINS, Jimmy GADSON, and others, and that he is also, at times, being supplied with narcotics

by them.  The intercepted communications also demonstrate that Quinton PINKINS is actively orchestrating interstate re-supply trips for the DTO.

On May 6, 2021, at WD/PA Miscellaneous Number 21-mc-294(B), the interception of wire and electronic communications over Quinton PINKINS's TT4 was authorized for a period of 30 days.  Unfortunately, interceptions over TT4 on that date revealed that Quinton PINKINS was being advised to stop using TT4 and start using another phone instead – which turned out to be TT5 as further detailed below.

On May 6, 2021, a call was intercepted over TT4 between Quinton PINKINS and Jessica LAVERTY.  During the call, they discussed a fatal drug overdose that occurred on May 2, 2021 (prior to interceptions occurring over TT4).  During the initial portion of the conversation, LAVERTY asks, "Can I come see you?", and Quinton PINKINS responds negatively, "Naw, I had chilled out bae." LAVERTY immediately responds, "Good, good, because I said throw the phone away." Quinton PINKINS asks for clarification, "Huh?", and LAVERTY re-emphasizes, "Throw your phone away," to which Quinton PINKINS responded, "Yea."

LAVERTY then goes into further detail regarding the female overdose victim and the response from local law enforcement. LAVERTY informed Quinton PINKINS that the victim's sister "had the phone and gave the cops the phone" because there were communications between the victim and Quinton PINKINS on the phone.  LAVERTY said "cause I guess there was messages from you and her." LAVERTY then referenced her conversation with a third party who was discussing the victim's narcotics supplier as Quinton PINKINS, "She's been getting off some 'Q'." LAVERTY further recalled the conversation with the third party and told Quinton PINKINS that she falsely denied

knowing him/"Q", "I was like I don't know who she gets off of. I was like I never heard of him." LAVERTY then stated that the third party "was like well I have it and we have it in messages and we gave the phone over to the cops."

LAVERTY then stated again during the same call that Quinton PINKINS should discard his telephone, "So, yea I just like I said I didn't know if you still had anything but I just letting you know to like. Get another throw away phone." In response, Quinton PINKINS stated, "I had shut down because of that. I'm like I ain't see her the day before" – informing LAVERTY that he was being careful and attempting to distance himself from the overdose victim.

On May 7, 2021, which was the day after the Quinton PINKINS/LAVERTY call discussed above, Quinton PINKINS, now utilizing TT5/912-548-9431, called London PINKINS to inform him that he (i.e., Quinton PINKINS) obtained a new telephone number to replace TT5. After London PINKINS answers the call, Quinton PINKINS immediately notifies him of the new telephone number, "Neph, this my new one," to which London PINKINS affirms, "Aight, bet." General conversation ensues and then London PINKINS informs Quinton PINKINS that he wants to meet with Quinton PINKINS after dropping his kids off, "I'm bout to uh, probably hit you when I drop them off and shit, after this." Quinton PINKINS states that he'll be away from his house, "I'll be out of traffic," and London PINKINS responds that Quinton PINKINS can come to him, "Aight, or just pull up on me. Cause I ain't tryin to come in Farrell bruh." Quinton PINKINS then states that he will be out and about meeting with narcotics customers, "I'm goin to hit my plays, I ain't goin no, I'm hittin my plays."

On May 13, 2021, Jimmy GADSON, using TT2, texted Quinton PINKINS/TT5, informing him that an unidentified person was going to be in the area, "Chic comn n town he gone b here". Quinton PINKINS, via a text from TT5, expressed a desire to meet up with Chic, "When I need to see him", and GADSON replied with a text to TT5 informing Quinton PINKINS that Chic would arrive around 2 pm, "He will b here round 2". Based on my training and experience, and the results of the investigation so far, I believe GADSON was texting Quinton PINKINS for the purpose of facilitating a face-to-face meeting between Quinton PINKINS and Chic to secure more drugs for the DTO to distribute.

On May 14, 2021, London PINKINS, using TT1, called Quinton PINKINS/TT5. It should be noted that Quinton PINKINS was promptly identified as the user of TT5 based not only on the corresponding content of the TT5 communications vis-à-vis TT4, but also on the sound of his voice and his manner of speaking that directly correspond with the sound of the voice and manner of speaking of the user of TT4. During the May 14 call, London PINKINS asked, "Whatchu doin?", and Quinton PINKINS responded, "Sitting on the porch about to hit this play" – meaning Quinton PINKINS was getting ready to conduct a drug deal from the **LEE AVENUE LOCATION**. Shortly thereafter during the call, Quinton PINKINS again references dealing drugs from the **LEE AVENUE LOCATION** – "Yea, I'm up just trappin." London PINKINS then informs Quinton PINKINS that he is going to give Nicholas OSTHEIMER, a/k/a Kool, the number to TT5 – "Hey I'm about to give Kool this number though" – so that OSTHEIMER can contact Quinton PINKINS to discuss drug deals with him as well. Quinton PINKINS responded affirmatively, "Alright".

The interception of communications over Quinton PINKINS's 912-548-9431 number/TT5 was authorized via judicial order on May 25, 2021.  Communications intercepted over TT5 since that time demonstrate that Quinton PINKINS is continuing to deal drugs on a daily basis.  The intercepted communications also demonstrate that PINKINS is storing drugs at/dealing drugs from the **LEE AVENUE LOCATION.**

For example, on May 27, 2021, Courtney PURDY, using number 724-893-4124, exchanged communications with Quinton PINKINS during which she ordered a particular quantity of narcotics from PINKINS – "I need 3 whole ones of the white dawgg then 1 whole one separate from the other 3."  PINKINS agreed to supply PURDY with the drugs, but informed her that he was not at his residence but would travel to his residence (i.e., the **LEE AVENUE LOCATION**) to pick up the drugs.

Subsequent communications intercepted over TT5 between Quinton PINKINS and PURDY demonstrate that PURDY is coming to meet PINKINS to be supplied with drugs on a nearly daily basis and that PINKINS is at, or leaving from, the **LEE AVENUE LOCATION** to complete many of the deals.  For example, on June 6, 2021, PURDY texted PINKINS and told him that she wanted a particular quantity of drugs – "I need to see you for 6 whole ones of the dawgg" – and was coming to PINKINS to be supplied – "Aright I'm packing the car up now".  PINKINS agreed to do the deal at or near the **LEE AVENUE LOCATION** as requested by PURDY with the text message "K".  PURDY then informed PINKINS when she arrived with the text message "Here babe".

### I.     LEE AVENUE LOCATION & THE WHITE CADILLAC

The **LEE AVENUE LOCATION** is a two-story, single-family house with a covered front porch and an attached wooden wheelchair-style access ramp. The numbers

"718" are to the right of the front door.  This is the residence of Quinton PINKINS that he uses to traffic illegal drugs.

The **WHITE CADILLAC** has OH Temporary Registration M545192.   It is registered to Emma PINKINS at 724 Lee Ave, Farrell, PA 16121. It is used by Quinton PINKINS to traffic illegal drugs.

A pole camera has been transmitting simultaneous video of the exterior of the **LEE AVENUE LOCATION** to case agents for the last few months.  The pole camera video, physical surveillance, and intercepted communications have revealed numerous instances of Quinton PINKINS entering into/exiting from the **LEE AVENUE LOCATION** and the **WHITE CADILLAC**.  The **WHITE CADILLAC** has been consistently parked in the vicinity of the **LEE AVENUE LOCATION** in recent months.  In recent months, Quinton PINKINS traveled to meet with London PINKINS as well as with drug customers using the **WHITE CADILLAC**.

Based on the knowledge I have gained from my training and experience, as well as from this investigation, there is probable cause to conclude that the **WHITE CADILLAC** contains evidence of the crimes discussed herein just as many other vehicles operated by drug dealers have contained such evidence as confirmed by numerous prior searches. Likewise, there is probable cause to conclude that the **LEE AVENUE LOCATION** contains evidence of the crimes discussed herein just as the residences of many other drug dealers have contained such evidence as confirmed by numerous prior searches.  This conclusion is established not only by the information already stated in this affidavit, but also by additional information, such as additional intercepted communications.

For example, the fact of the **LEE AVENUE LOCATION** serving as Quinton PINKINS's residence is apparent not only from the pole camera and physical surveillance referenced above, but also from GPS location data for his cell phones (TT4 and TT5) obtained via judicial warrants as well as from intercepted communications. For example, a call was intercepted over TT4 in recent months during which PINKINS identified himself and discussed having water service activated at the **LEE AVENUE LOCATION** because he is renting that location.

On April 18, 2021, Quinton PINKINS, using TT4, and London PINKINS, using TT1, had a telephone conversation about London PINKINS and Nicholas OSTHEIMER meeting with Quinton PINKINS at the **LEE AVENUE LOCATION**. During the call, Quinton PINKINS said, "I got that forty ball....you heard me?" – referring to a quantity of drugs. London PINKINS replied, "You killing them huh?" – referring to the quantity of drugs Quinton PINKINS is distributing. Quinton PINKINS responded, "I said I got that forty ball hell ya I'm killing them" – reiterating that he has the drugs and that he is distributing a lot of drugs. Shortly after this exchange, the call concluded with London PINKINS stating that he and OSTHEIMER, a/k/a "Kool," would meet Quinton PINKINS at the **LEE AVENUE LOCATION** – "me and Kool about to meet you down there."

Later on the same day, April 18, 2021, another call was intercepted between London PINKINS and Quinton PINKINS during which it was revealed that they, along with OSTHEIMER, had met at the **LEE AVENUE LOCATION**. The call also revealed that Quinton PINKINS supplied a female drug customer at the **LEE AVENUE LOCATION** and thought thereafter that the female drug customer stole additional drugs

from inside the **LEE AVENUE LOCATION**.  Quinton PINKINS was relieved when he found the temporarily missing stash of drugs inside of the **LEE AVENUE LOCATION**.

During this April 18 call, Quinton PINKINS told London PINKINS, "Naw I was just, remember when ya'll came? It was you, ... U/I.. and fuckin Kool?", "man that bitch got me for 8 grams bro."  Quinton PINKINS then explained that he gave the female drug customer some of the drugs and gave OSTHEIMER some of the drugs: "so I gave her one outta there and had it on the table and got Kool and shit, that one outta the other bag, you feel me?"  Quinton PINKINS then stated, "and it just hit my mind to search my whole crib, it ain't in my stash with the rest of my shit."  Later during the conversation about the female stealing drugs from Quinton PINKINS at the **LEE AVENUE LOCATION**, Quinton PINKINS found the missing drugs in a pair of his pants at the **LEE AVENUE LOCATION**: "bro, gave her one of the packs outta there and she was short bro. She got me good bro. No she didn't, no she didn't, no she didn't. It was in these pants, I take that back."

### J.    SHERMAN AVENUE LOCATION & THE DODGE DART

The **SHERMAN AVENUE LOCATION** is a two-story, multi-family duplex.  The front door for the location is on the left side of the covered front porch. The number "596" is displayed to the right of the location's front door.  This is the residence of Jimmy GADSON that he and others use to traffic illegal drugs.

The **DODGE DART** is registered to Debra GADSON at 3839 Quaker Circle, Hermitage, PA 16148.  Debra GADSON is Jimmy GADSON's mother.  This vehicle is used by Jimmy GADSON to traffic illegal drugs.

A pole camera has been transmitting simultaneous video of the exterior of the **SHERMAN AVENUE LOCATION** to case agents for the last several months.  The pole camera video, physical surveillance, and intercepted communications have revealed numerous instances of Jimmy GADSON entering into/exiting from the **SHERMAN AVENUE LOCATION** and the **DODGE DART**.  The **DODGE DART** has been consistently parked in the vicinity of the **SHERMAN AVENUE LOCATION** in recent months.  In recent months, Jimmy GADSON traveled to meet with drug customers on numerous occasions using the **DODGE DART**.

For example, as stated above, on March 25, 2021, GADSON, using TT2, exchanged wire and electronic communications with a regular customer to set up another drug deal.  The male customer, using number 724-931-5356 (subsequently identified as Aubrey GROSE), and GADSON exchanged text messages setting up a one gram drug deal at a Country Fair convenience store.  The customer texted, "Can you bring a gram out in the next hour?"  GADSON replied with the text "Omw to you now leaving down town now".  This is one of many drug deals between GADSON and GROSE during the last few months that involved GADSON traveling to deal the drugs to GROSE.  GADSON used the **DODGE DART** to drive to GROSE to complete many of these deals.

Based on the knowledge I have gained from my training and experience, as well as from this investigation, there is probable cause to conclude that the **DODGE DART** contains evidence of the crimes discussed herein just as many other vehicles operated by drug dealers have contained such evidence as confirmed by numerous prior searches.  Likewise, there is probable cause to conclude that the **SHERMAN AVENUE LOCATION** contains evidence of the crimes discussed herein just as the residences of

many other drug dealers have contained such evidence as confirmed by numerous prior searches.  This conclusion is established not only by the information already stated in this affidavit, but also by additional information, such as additional intercepted communications.

For example, on March 17, 2021, GADSON, using TT1, and Michael LOVE, using a phone with number 724-877-0759, exchanged communications during which GADSON agreed to supply drugs to LOVE and directed LOVE to meet GADSON at the **SHERMAN AVENUE LOCATION** to complete the deal.  GADSON asked LOVE if he wanted a particular quantity of drugs – " Just 1 and a 1/2 of hard?".  LOVE confirmed that was the amount of drugs he wanted – "Yeah."  GADSON then sent a text message directing LOVE to meet at the **SHERMAN AVENUE LOCATION** – "You have to come to me I'm home 596 Sherman Sharon PA".

GADSON's co-conspirators also use GADSON's residence/the **SHERMAN AVENULE LOCATION** to traffic illegal drugs.   The **SHERMAN AVENUE LOCATION** is one of several locations that London PINKINS has used to traffic illegal drugs along with his co-conspirators.  For example, on May 13, 2021, a call was intercepted over TT1 between London PINKINS and Maurice ATWOOD. During this call, PINKINS directs ATWOOD to the **SHERMAN AVENUE LOCATION** to meet him.  The meeting between them at the **SHERMAN AVENUE LOCATION** was then observed by agents via the pole camera near that location.  During the call setting up the meeting, ATWOOD asked PINKINS, "What's up? I'm pullin back down in now, you want me to grab it for you?". PINKINS replied, "You could do that for me Unc?". ATWOOD stated, "Yea, you just give me what you gotta give me. Yea but I'm goin down there right now." PINKINS

stated, "Alright, uh, I'm, I'm bout to be right there on Sherman, at Loko crib" ("Loko" is Jimmy GADSON's well-known street name). Following the call, PINKINS sent a text message to ATWOOD stating "596 Sherman" – identifying the **SHERMAN AVENUE LOCATION** as the meet location.

## K.     HAMILTON AVENUE LOCATION

The **HAMILTON AVENUE LOCATION** is a two-story, single-family house with brick porch pillars.  The number "402" is above the porch.  This is the residence of Denzel WILLIAMS that he uses to traffic illegal drugs.  WILLIAMS has worked closely with Jimmy GADSON to distribute illegal drugs in Mercer County.

WILLIAMS has been dealing drugs in Mercer County for an extended period of time.  Agents with the Pennsylvania Attorney General's Office, the Pennsylvania State Police, and a DEA Task Force Officer, along with a confidential source, conducted a controlled purchase of 54 grams of cocaine base directly from WILLIAMS in November 2019.  This controlled purchase is charged as one of the counts in one of the pending indictments referenced above.

The November 2019 controlled purchase occurred at a residence on Hamilton Avenue in Farrell, PA.  This residence is near the **HAMILTON AVENUE LOCATION** to be searched.   WILLIAMS has been residing at the **HAMILTON AVENUE LOCATION** for at least the last several months as confirmed by CS5.  Agents conducting this investigation have observed WILLIAMS and his known vehicles at the **HAMILTON AVENUE LOCATION** approximately a dozen times during the last several months.  In addition, WILLIAMS's girlfriend resides at this location and her vehicle has been observed there as well in recent months.

The November 2019 controlled purchase of cocaine base from WILLIAMS was arranged through telephone communications between the confidential source who made the purchase and WILLIAMS.  WILLIAMS was using telephone number 724-734-8233 at that time.  WILLIAMS was still using the same telephone number in 2021 as confirmed through communications intercepted between WILLIAMS and Jimmy GADSON over TT2.

The intercepted communications, in conjunction with corresponding surveillance observations, establish probable cause to conclude that the **HAMILTON AVENUE LOCATION** contains evidence of the crimes discussed herein just as the residences of many other drug dealers have contained such evidence as confirmed by numerous prior searches.  The intercepted communications also further demonstrate additional probable cause for a search warrant for the **SHERMAN AVENUE LOCATION**.

For example, on April 22, 2021, WILLIAMS, using his x8233 number, had a conversation with GADSON, using TT2.  During the conversation, WILLIAMS confirmed that he had a quantity of drugs, likely at the **HAMILTON AVENUE LOCATION**, that he wanted some of their (i.e., GADSON's and WILLIAMS's) customers to test out.  WILLIAMS's references to "fall out" and "droppin'" are references to people overdosing.  WILLIAMS agreed to bring some of the drugs to GADSON's residence/the **SHERMAN AVENUE LOCATION**.

 JG: Yo.

DW: Yo.

JG: Yo.

DW: You around?

JG: I'm at the spot.

DW: What your crib?

JG: Mmm-hmmm.

DW: You got some people to try something?

JG: Yeah. Wes right here.

DW: West?

JG: Mmm-hmm.

DW: Bitch'll fall out.

JG: They was sayin that shit, they ain't like that.

DW: Huh?

JG: Everybody I was fucking with that shit, they didn't like that.

DW: You know why, motherfuckers?

JG: Yeah, that is why, you're right.

DW: (laughs)

JG: No, you're right.

DW: Because it's...I told you that though.

JG: Yeah, cuzzo ain't been fuckin with him. He ain't been fucking with him, and then, he fucked with me yesterday with the, umm, tan.

[Voices Overlap]

DW: And what he said?

JG: He like that. That's what he want.

DW: I told you, that's what, cause look.

JG: That's what, he said that's what the same shit he want his rollin' 60's, you know, you

know because they Crips.

DW: Look, that's..oh, that's with cuz was liking Pistol, he like bro, that tan, that's it you know.

JG: That's why I said the crips.

DW: That's what I told you the first day. You can't give that to your people unless you gotta, you know what I mean?

JG: Mmm-hmm.

DW: 'Cause you gon'...like look at now

JG: I know.

DW: Everything you get is gonna be better.

JG: No, I got that. I just couldn't get to it. U/I that's why I told you I just get that to hold me over.

DW: Oh, nah, shit. Yeah, shit. If you can't get to that, you better get to that.

JG: I know.

DW: You can't go from droppin' a motherfucker, to you know.

JG: Mmm-hmm.

DW: But I got some, I got some shit now. I want your people to try it. I don't wanna, my dude tell me to try it I ain't everybody ain't even here so except for one person but I need to hurry up and get a read[PH].

JG: Oh. Aight pull up.

DW: Where you at? Can you have your people pull up?

JG: [U/I]

DW: Nah, where you at?

JG: I told you where I'm at, man. The spot, motherfucker.

DW: Alright, shit, I'll be over your crib in 5 minutes.

JG: A'ight.

Communications intercepted over TT2 in May 2021 further demonstrate that GADSON and WILLIAMS work together to deal illegal drugs in Mercer County.  On May 18, 2021, frequent customer and co-conspirator Michael LOVE ordered a particular quantity of illegal drugs during a call with GADSON – "one up and half down unless you front me the other half 'till tomorrow."  After GADSON agreed to the deal, he directed LOVE to contact the following phone number to complete the deal – "724-734-8233". This is Denzel WILLIAMS's phone number.

Communications intercepted over TT2 between GADSON and co-conspirator Albert CUMMINGS, in conjunction with surveillance, further demonstrate that WILLIAMS is engaging in an ongoing drug trafficking business with GADSON, CUMMINGS, and others.  CUMMINGS is a Cleveland-based source of supply for GADSON, WILLIAMS, London PINKINS, and other co-conspirators.  He has a street name of "Shabba" as referenced above in the CS5 information section.

On March 30, 2021, a call between GADSON (TT2) and CUMMINGS, who was using number 216-309-9183, was intercepted.  During the call, they discussed the quality of the drugs CUMMINGS had ready to supply and GADSON testing the drugs out on his customers.  This is an excerpt from the call:

AC: What's up, bro? I got some of this fire.

JG: What's it like? You know I'm on the, you know I'm on the top of the world right now.

AC: Uh, okay. Top of the world.

JG: I mean if its better and the price is better, you know I [U/I].

AC: Uh?

JG: All you gotta do is let me see what it's like.

AC: What you gonna have your people do it?

JG: Yeah.

AC: A'ight, I'll be going there in a little while.

During a follow-up call that day between GADSON and CUMMINGS, they discussed CUMMINGS hiding a sample quantity of the drugs inside GADSON's residence/the **SHERMAN AVENUE LOCATION**.  This is an excerpt from the call:

JG: A'ight, bet, bet. Or just, uh, just leave one little thing, just to see it. You heard me?

AC: Yeah, I'ma leave two of the, I got two different kinds. I'ma leave both of them.

JG: A'ight, just to see.

AC: And I'ma close the door, uh, the wizzard left.

JG: Ain't nobody in there?

AC: Uh-uh (negating]

JG: Well, just close it. Lock it when you leave. You know you gotta slam it hard.

AC: Yeah, I'ma put it. I'ma put it behind this, uh, cable box.

JG: No, or you can take it upstairs or throw it in the trash can, under the, uh, under the bag.

AC: Yeah, I'ma put it in the trash can, under the bag.

On May 24, 2021, CUMMINGS made multiple attempts to communicate with GADSON over TT2, all of which went unanswered. Later that afternoon, GPS/E911 data for CUMMINGS's cell phone indicated that CUMMINGS had departed Cleveland, Ohio, and was travelling toward Western Pennsylvania. At approximately 5:00 pm, pole camera

surveillance in the area of the **SHERMAN AVENUE LOCATION** revealed a black Dodge Ram pickup arrive and park in the vicinity of the location. Contemporaneous GPS/E911 data confirmed that CUMMINGS's cell phone was also in that area.

Pole camera surveillance showed CUMMING's exiting the Dodge Ram and walking toward the **SHERMAN AVENUE LOCATION**.  CUMMINGS appeared to enter the residence. Shortly thereafter, CUMMINGS was observed on the front porch of the residence and walking around the front yard before re-entering the residence. It should be noted that contemporaneous wiretap interceptions confirmed that GADSON was in Georgia and not at his residence that day.

At approximately 5:16 pm, surveillance confirmed the registration on the Dodge Ram as Ohio Temporary Tag M619375. At approximately 6:10 pm, CUMMINGS and an unknown male exited the area of the **SHERMAN AVENUE LOCATION** and departed in the Dodge Ram pickup. The pickup was observed arriving back at the **SHERMAN AVENUE LOCATION** approximately ten minutes later.

At 6:35 pm, a blue Nissan Altima arrived on Sherman Avenue and parked across the street. Denzel WILLIAMS was observed exiting the Nissan Altima and entering the passenger side of the Dodge Ram pickup. Two minutes later, WILLIAMS exited the Dodge Ram and briefly returned to the Nissan Altima before again returning to the passenger seat of the Dodge Ram. WILLIAMS remained in the Dodge Ram for 25 minutes before exiting to briefly return to the Altima and again re-entering the passenger side of the Dodge Ram.

The Dodge Ram then departed the area and returned approximately 30 minutes later. At 7:36 pm, WILLIAMS exited the Dodge Ram and returned to the Nissan Altima. At the same time, the Dodge Ram departed Sherman Avenue.

Law enforcement conducting physical surveillance observed the Dodge Ram traveling on I-80 in Ohio. As the vehicle neared the intersection of I-80 and I-480, officers with the Bedford Police Department attempted to conduct a traffic stop on the Dodge Ram. Upon activation of overhead emergency lights, the Dodge Ram immediately proceeded to flee from the marked police unit. Local/state law enforcement pursued the Dodge Ram until a decision was made to terminate the pursuit for safety concerns and after the Dodge Ram was lost in vehicle traffic.

It should be noted the GPS/E911 location data for CUMMINGS's phone was consistent with the movement of the Dodge Ram pickup. Later that same evening, law enforcement observed that the GPS/E911 location data placed the cell phone near the Cleveland Heights Police Department. Investigators later learned that a family member of CUMMINGS reported at that time that the Dodge Ram supposedly had been stolen.

Based on my training, experience, and knowledge from the investigation thus far, I believe CUMMINGS's left Cleveland on May 24, 2021, with narcotics and traveled to Western Pennsylvania for the purpose of distributing the narcotics.  This conclusion is corroborated by the meeting between CUMMINGS and WILLIAMS in the Dodge Ram pickup outside the **SHERMAN AVENUE LOCATION**.  Furthermore, I believe CUMMINGS was travelling back to Cleveland with narcotics and/or narcotics trafficking proceeds when he fled from police in the Dodge Ram and then had a family member falsely report that the Dodge Ram had been stolen.

### L.    WOODROW COURT LOCATION AND THE WHITE JEEP

The **WOODROW COURT LOCATION** is a two-tone, two-story, single-family residence with a covered front porch.  The number "47" is to the left of the front door.  This

is the residence of London PINKINS's mother that he uses to traffic illegal drugs.    It is one of several locations that PINKINS and his crew use to traffic illegal drugs.

The **WHITE JEEP** is registered to Jasmine PEGUES at 1129 Hamilton Avenue, Farrell, PA.  As established below, this vehicle is used by London PINKINS to traffic illegal drugs.

A pole camera has been transmitting simultaneous video of the exterior of the **WOODROW COURT LOCATION** to case agents in recent weeks.  The pole camera video, physical surveillance, and intercepted communications have revealed numerous instances of London PINKINS entering into/exiting from the **WOODROW COURT LOCATION** and the **WHITE JEEP**.  In recent months, PINKINS traveled to meet with customers and co-conspirators on numerous occasions using the **WHITE JEEP**.

For example, on March 24, 2021, PINKINS used TT1 to set up a drug deal with a male customer who was using a phone assigned number 724-971-0232.  The exchange of communications between PINKINS and the customer included the following phone call from the customer requesting an ounce ("zip") of illegal narcotics from PINKINS. PINKINS agreed to drive to the customer to complete the deal, likely using the **WHITE JEEP**:

LP: What's good wit you?

UM: Yo?

LP: What's good?

UM: Uh you can bring me a zip bruh?

LP: Yea, I got you.

UM: How long it gonna be?

LP: Shit, I'm getting up now, Ima hit you as soon as I'm enroute.

UM: Aight, bet, I need that shit asap.

LP: Aight, I got you.

On this same date, at 5:39 p.m., PINKINS received an incoming phone call from Albert CUMMINGS who was using his cell phone with number 216-309-9183.  During this call, PINKINS originally proposed meeting with CUMMINGS to discuss and/or complete a drug transaction at the **ORANGE DRIVE LOCATION**, but then arranged to meet with CUMMINGS at Jimmy GADSON's ("Lok's") residence/the **SHERMAN AVENUE LOCATION** instead**:**

LP: Yo.

AC: This dumb ass GPS ain't even workin unc.

LP: You know where Orange Village at?

AC: Orange Village? Right there, where Pop wa...where Pop live at? Where Unc live at?

LP: Naw.

AC: Where the fuck Orange Village at? I'm bout to fittin to go, I'm bout to just go to Lok's spot.

LP: Aight I'm bout meet ya over there.

AC: Don't I, don't we don't got no, hello? Hello?

LP: Yea I'm bout to meet you over there.

AC: I was bout to say, you could just come pick me up from over there, you drivin?

LP: Hell naw.

AC: Where the fuck Orange Village at? Where Orange Village at?

LP: Yo.

AC: Huh?

LP: What you talkin bout?

AC: I said where you at? Where Orange Village at bro?

LP: Oh, shit, it's like it's downtown Sharon, Lok know where it's at.

AC: I ain't bout to go, I'm wantin to come straight to you I wasn't bout to go over Lok house.

LP: Yea, I texted you the address, it's just pull it up in your GPS.

AC: It's behind McDonalds?

LP: You gotta go past McDonalds.

AC: Huh?

LP: I said you gotta go past McDonalds.

AC: U/I.....Orange Village, that's in the fuck is up there, you talkin bout where what's a name be at?

LP: Who?

AC: U/I

LP: Well just go somewhere, I'm bout to just pull up on you bro.

AC: You can't come up Unc's house.

LP: Naw...that's what I'm sayin, I'm bout to…you feel me?

AC: Aight I'm bout to just pull up in front of Lok's house.

     In a follow up call about 40 minutes later, PINKINS tells CUMMINGS that he (i.e., PINKINS) is "Bout to pull up bro."  Contemporaneous surveillance of the **SHERMAN AVENUE LOCATION** revealed a red/orange Lexus arrive outside and stop in front of

the residence. This was the same vehicle identified by CS5 as "Shabba's" vehicle, who, as noted herein, was subsequently identified as CUMMINGS.

Approximately 5 to 10 minutes later, PINKINS arrived in the area in the **WHITE JEEP**, circled the block near the **SHERMAN AVENUE LOCATION**, and then pulled up to the Lexus in front of that location. CUMMINGS was positively identified by surveillance agents exiting the Lexus and entering the front passenger side of PINKINS's **WHITE JEEP**. It is believed that CUMMINGS wanted to meet with PINKINS to discuss the supply of illegal narcotics to the DTO.

Physical surveillance conducted on May 3, 2021, near the **WOODROW COURT LOCATION** further connected that location and the **WHITE JEEP** to London PINKINS. On that date, Corey ADKINS, who is known to be a close associate of PINKINS, was observed walking up to the **WOODROW COURT LOCATION** where PINKINS was standing in front of that location. PINKINS and ADKINS were then observed engaging in a hand-to-hand encounter involving an object that could not be identified from a distance.

ADKINS then walked to the passenger side of the **WHITE JEEP** that was parked across from the **WOODROW COURT LOCATION**. ADKINS opened the rear passenger-side door and placed the bookbag he had been wearing on his back inside the vehicle. ADKINS continued to access the rear compartment of the vehicle while simultaneously moving his body in/out of the door. ADKINS eventually retrieved the bookbag and placed it on his back before closing the rear passenger door of the **WHITE JEEP**. PINKINS then entered the **WHITE JEEP** and drove it away as ADKINS walked away from the **WOODROW COURT LOCATION**.

On May 5, 2021, in the evening hours, agents intercepted communications between co-conspirator Amanda KARWOWSKI and London PINKINS during which KARWOWSKI asked PINKINS for a certain quantity of drugs.  PINKINS agreed to supply KARWOWSKI and directed her to an apartment located in Mercer County (455 McCleary St, Sharon, PA 16146). Shortly thereafter, agents established physical surveillance at this apartment and observed KARWOWSKI in a rental vehicle in front of the building. Approximately one minute later, PINKINS sends KARWOWSKI a text message advising her "5 minutes".  Following this text message, agents observed the **WHITE JEEP** arrive at the apartment building.

Agents then observed PINKINS exit the driver's side of the **WHITE JEEP** and meet with KARWOWSKI at the driver's side of her vehicle. Shortly thereafter, PINKINS returns to the **WHITE JEEP**, where Nicholas OSTHEIMER and Cleven ATWOOD were standing.  KARWOWSKI departed from the area and PINKINS, OSTHEIMER, and ATWOOD walked together to a second story apartment.  It should be noted that, later in May 2021, KARWOWSKI was arrested by the PSP for PWID cocaine base and methamphetamine after meeting with PINKINS.

PINKINS's use of the **WOODROW COURT LOCATION** to traffic illegal drugs is established by communications intercepted over his TT1 in addition to the evidence already included herein.  For example, on April 8, 2021, Keith WILDER, using telephone number 724-734-9595, and PINKINS had a conversation over TT1 setting up a drug deal at PINKINS's mother's house/the **WOORDROW COURT LOCATION**.  WILDER is one of PINKINS's most frequent drug customers, engaging in drug deals several times a week.  Some of the drug deals involved rather explicit phone communications, including

on May 1, 2021, when WILDER told PINKINS that he (i.e., WILDER) did not know that the drugs PINKINS gave him "was all broke up like that."  PINKINS replied, "I'm about to do some more now, I mean if you want me to I"ll I'll trade you out. . . ."

   During the April 8, 2021, call referenced above, PINKINS informed WILDER that he was at the **WOODROW COURT LOCATION** and would do the drug deal with WILDER there, but he did not have a scale to weigh the drugs at that location.  This is the call:

KW: Hey what's up?

LP: What's up?

KW: Where you at?

LP: Uh.

KW: I need to see you.

LP: I'm at my mom's, I don't got no scale over here though.

KW: Mmm, that ain't nothin, I need to see you for real.

LP: Uh, shit I'm bout to go grab a board fam, I'ma call you I'ma be right back over here though.

KW: Ok, alright when you hit me up I'll come over there.

LP: Aight.

KW: Aight.

   On April 13, 2021, several phone calls were intercepted between London PINKINS and his mother, Patrice PINKINS, referencing the **WOODROW COURT LOCATION**. London PINKINS called his mother and asked her if the door was locked at her residence because he had left money/drug proceeds inside – "Tryin make sure, uh, the door locked?

I done left all my money in ya house. I was tryin to rush around and do everything else." Patrice PINKINS asked, "You did what?"; and London PINKINS stated, "Left all my money in your house, just make sure the door locked." Patrice PINKINS continued talking with London PINKINS, and London PINKINS remained concerned about the door being locked to the **WOODROW COURT LOCATION**. London PINKINS stated, "Ma I'm not even laughin right now, I got stuff goin on."

On April 12, 2021, London PINKINS and a female had a phone conversation during which the female referenced PINKINS's mother's house/the **WOODROW COURT LOCATION** being PINKINS's trap house (i.e., stash house) for dealing drugs – "I know where your mom live, I know where the trap is (laughs)."   PINKINS did not deny that the **WOODROW COURT LOCATION** was a trap house.  He did, however, clarify that he has more than one trap house – "Which one? I got I got a couple of them."   PINKINS minimizes the number of trap houses he has by stating that he only has a couple of them when he has several as established herein.

### M.    EUCLID AVENUE LOCATION

The **EUCLID AVENUE LOCATION** is a two-story, single-family house with a covered front porch and a detached garage located on the side.  The number "67" is on the left front-porch pillar.  This is the residence of Jeronte "Jump" ROBINSON that he, London PINKINS, and others use to traffic illegal drugs.

Over the last several months, physical surveillance agents have observed London PINKINS and several of the other members of his drug trafficking crew, including ROBINSON, Nicholas OSTHEIMER, and Nicholas TANTUO, at the **EUCLID AVENUE LOCATION** on several different occasions.  They were often engaging in conduct that is

very consistent with drug trafficking.  They were observed meeting with various people who would pull up to the location, stay for short periods of time, and then leave.

For example, on April 7, 2021, in the early evening, agents established physical surveillance near the **EUCLID AVENUE LOCATION** and observed OSTHEIMER and TANTUO conducting suspected drug transactions. Prior to these observations, agents intercepted a phone call between PINKINS and OSTHEIMER during which PINKINS told OSTHEIMER, "Yea I need to come over that way, what you doin?".  Shortly after this call, PINKINS participated in another intercepted communication with a male during which PINKINS set up a drug transaction with the male. The male asked PINKINS, "Where you at, the spot?", and PINKINS replied, "I'm bout to be over there in Sharon, by Subway."  It should be noted that there is a Subway restaurant across from the **EUCLID AVENUE LOCATION**. The male replies, "Aight bet, you want me to meet you out there?", and PINKINS replies, "Yea hell yea." While conducting surveillance this day, agents observed TANTUO exit the **EUCLID AVENUE LOCATION** and depart the area in the **TAN COBALT**.

On May 10, 2021, agents conducted additional physical surveillance at the **EUCLID AVENUE LOCATION**. In the evening hours, agents observed the **TAN COBALT** parked on the street in front of the **EUCLID AVENUE LOCATION.** A gray Ford Escape with a female driver was observed parked behind the **TAN COBALT.** Approximately 4 minutes later, PINKINS exited the **EUCLID AVENUE LOCATION** and met with the female at the driver's side of the Ford Escape. PINKINS was observed reaching in her vehicle and then returned to the front porch of the **EUCLID AVENUE LOCATION**.  The female departed. Several minutes later, PINKINS met with a male, who

arrived in a silver Nissan Maxima, on the front porch of the **EUCLID AVENUE LOCATION**. This male then departed immediately after meeting with PINKINS.

On May 18, 2021, London PINKINS supplied at least 54 grams of cocaine base to co-conspirator Amanda KARWOWSKI at the **EUCLID AVENUE LOCATION** after cooking the cocaine into base/crack form at Kenneth MILLER's **CATHEDRAL DRIVE LOCATION**. About two hours after PINKINS supplied KARWOWSKI with the cocaine base at the **EUCLID AVENUE LOCATION**, she was the subject of a PSP traffic stop and arrest during which she got caught with 54 grams of cocaine base in her car.

This transaction between PINKINS and KARWOWSKI involved early morning communications on May 18, 2021, during which PINKINS told her that he would supply her later that day because he had not cooked the cocaine base yet – "Early sorry I didn't cook it yet". Later on May 18, PINKINS told Kenneth MILLER that he needed to use the kitchen at the **CATHEDRAL DRIVE LOCATION** to cook the cocaine into cocaine base/crack – "I need to use the kitchen, bro" and "Be there in 5 turn the stove on".

After these communications between PINKINS and MILLER, KARWOWSKI texted PINKINS asking where to meet to do the deal and apologizing for her delay – "My bad had some stops to make. I'm in Sharon whenever so just let me know where". PINKINS replied with the following text message directing KARWOWSKI to the **EUCLID AVENUE LOCATION** – "67 Euclid". Thereafter, KARWOWSKI texted "Here" to PINKINS to let him know that she arrived at the **EUCLID AVENUE LOCATION**. PINKINS replied with the text "Come on the porch".

As the communications between PINKINS/MILLER and PINKINS/KARWOWSKI were being exchanged and intercepted, agents conducted

surveillance at the **CATHEDRAL DRIVE LOCATION** and the **EUCLID AVENUE LOCATION**.   During the surveillance, constant foot and vehicle traffic to/from the **EUCLID AVENUE LOCATION** was observed which is consistent with drug trafficking. Also during the surveillance, PINKINS and OSTHEIMER were observed leaving the **EUCLID AVENUE LOCATION** and shortly thereafter arriving at the **CATHEDRAL DRIVE LOCATION**.   PINKINS thereafter returned to the **EUCLID AVENUE LOCATION** where he was observed meeting with KARWOWSKI.  KARWOWSKI then drove away from the **EUCLID AVENUE LOCATION** and, as noted above, was arrested less than two hours later with over 50 grams of cocaine base in her car.

PINKINS and his crew continued to use the **EUCLID AVENUE LOCATION** to traffic narcotics after the KARWOWSKI drug deal and subsequent arrest in May 2021. For example, on June 6, 2021, PINKINS had a conversation with ROBINSON over TT1. As noted above, ROBINSON resides at the **EUCLID AVENUE LOCATION**.  During the June 6 call, PINKINS asked, "Where you at?".  ROBINSON answered that he was at the **EUCLID AVENUE LOCATION** and was about to do a drug deal (i.e., "a bop") – "At the crib, bout to leave. Hit this bop real quick."  PINKINS responded, "I'm at your crib, bitch."  ROBINSON replied, "Yea, you bout to see me leave then nigga."

## N.   CATHEDRAL DRIVE LOCATION

The **CATHEDRAL DRIVE LOCATION** is an apartment in a building containing four separate apartments. This location is in the northwest corner of the building.  It can be entered directly from the outside via the apartment's front door.  The number "16" is above the front door.  This is the residence of Kenneth MILLER that he, London PINKINS, and others use to traffic illegal drugs.

As already stated in detail, PINKINS and his crew use the **CATHEDRAL DRIVE LOCATION** to cook cocaine into crack.  They have done so several times in recent months.  Some of the occasions when they have done so – May 12, 2021, May 18, 2021, and May 20, 2021 – have already been detailed herein and, as a result, will not be repeated in this section.

Intercepted communications demonstrate that MILLER not only allows PINKINS to use his kitchen to prepare drugs for distribution, he also receives drugs from PINKINS.  On May 28, 2021, a call between them was intercepted.  During the call, PINKINS asked, "What's good?"  MILLER answered that he wanted two different kinds and quantities of drugs from PINKINS – "Ain't nothin'. I need the 25 of hard and the 25 of boy."  PINKINS agreed to supply MILLER – "A'ight."

### O.     ORANGE DRIVE LOCATION AND THE TAN COBALT

The **ORANGE DRIVE LOCATION** is an apartment in a multi-unit, row-style apartment building.  The number "240" is on the apartment building.  The number "3" is above the front door of the location.  This is the residence of Nicholas TANTUO that he, London PINKINS, and others use to traffic illegal drugs.

The **TAN COBALT** is registered to Delisa SMITH at 328 Sterling Ave. Apt. D2, Sharon, PA. This vehicle is used by Nick TANTUO to traffic illegal drugs.  Delisa SMITH is TANTUO's girlfriend.

In addition to the information previously stated in this affidavit, the use by London PINKINS and TANTUO of the **ORANGE DRIVE LOCATION** and the **TAN COBALT** to traffic illegal drugs is established by intercepted communications and surveillance during the last few months.  For example, on April 19, 2021, Amanda KARWOWSKI

(about a month before she got caught with 50+ grams of London PINKINS's cocaine base as detailed above) sent a text message to PINKINS asking when she could meet with him to be supplied drugs – "You good in about an hour-1.5?"  PINKINS answered, "Yea." KARWOWSKI then texted PINKINS to let him know that she was on her way to meet with him – "Omw".  PINKINS replied with the location where he had the drugs to supply KARWOWSKI – "240 orange dr apartment 3" (i.e., the **ORANGE DRIVE LOCATION**).  Thereafter, KARWOWSKI sent text messages indicating that she had arrived near the **ORANGE DRIVE LOCATION**.  PINKINS told her during a subsequent call to come in to receive the drugs.

On May 10, 2021, KARWOWSKI texted PINKINS asking where she should go to pick up more drugs – "I'm in hermitage, where too?"  PINKINS replied by informing her to once again go to the **ORANGE DRIVE LOCATION** to receive the drugs.  PINKINS's text stated, "240 orange dr apartment 3".

PINKINS directed other drug customers to TANTUO's residence/the **ORANGE DRIVE LOCATION** in addition to KARWOWSKI.  On May 9, 2021, PINKINS sent another drug customer, self-identified as "Perna," to the **ORANGE DRIVE LOCATION**. In directing him to the specific apartment, PINKINS referenced the **WHITE JEEP** and the **TAN COBALT** (referred to in a call by the similar color "gold") that were nearby.

The transaction at the **ORANGE DRIVE LOCATION** on May 9 started with this incoming call to PINKINS/TT2:

LP: Hello

UM1649: LP

LP: Who this

UM1649: This is Perna, you know my stepdad he said. He said holla at you man, what's up playa.

LP: Who this?

UM1649: This Perna man

LP: Oh what's goodie.

UM1649: aint shit man, where you at? you around the way?

LP: yeah

UM1649: In Sharon?

LP: You got a time?

UM1649: Im trying U/I

LP: Yea i'm bout to uh, I ain't driving right now, I'll text you the address, im out in uh OV

UM1649: Alright send me the address, I got a ride.

LP: Alright.

PINKINS then texted the address for the **ORANGE DRIVE LOCATION** – "240 orange dr apartment 3". The customer then called PINKINS when he arrived to do the deal. PINKINS referenced his **WHITE JEEP** and TANTUO's **TAN COBALT** as nearby landmarks:

UM: Yo

LP: Yo

UM1649: Im in the apartment right now. Im trying to find this shit.

LP: You'll see a white jeep

UM1649: Huh?

LP: You'll see a white jeep and a little gold cobalt.

UM1649: Gold cobalt?

LP: Yea, and a white jeep.

UM1649: In the 200? Oh I think I see it down here. I should have went that way. Im about to bust a right right now. Im in a white Honda.

LP: It's like the third right. Third left I mean. When you come all the way down.

UM1649: Thats right about where we at. I see a honda civic, oh theres a fence right here, we gotta turn around. Oh alright I see where we gotta go.

LP: Alright

UM1649: Alright.

After this call, the customer texted PINKINS "At door" indicating that he was at the door to the **ORANGE DRIVE LOCATION** and ready to receive the drugs from inside.  The customer then called PINKINS.  During the call, PINKINS stated, "yeah, here I come" – indicating that he was coming out of the **ORANGE DRIVE LOCATION** to complete the deal.

On May 2, 2021, agents conducted surveillance at the **ORANGE DRIVE LOCATION**.  TANTUO's **TAN COBALT** and PINKINS's **WHITE JEEP** were parked beside each other outside of the location.  TANTUO was observed in the doorway of the **ORANGE DRIVE LOCATION** looking around the parking lot and then closed the door. Shortly thereafter, the curtains on the first floor of the location moved and several subjects appeared to look around the parking lot in a surveillance conscious manner.

### P.    WOODLAND PLACE LOCATION

The **WOODLAND PLACE LOCATION** is a single-family house.  The numbers "1054" are above the front door.  A driveway is on the side of the location.  This is the

residence of Nicholas OSTHEIMER that he, London PINKINS, and others use to traffic illegal drugs.  OSTHEIMER is also known to illegally possess firearms as evidenced by images from his social media Snap Chat story of him holding a pistol and pointing it at Kenneth MILLER inside of the **CATHEDRAL DRIVE LOCATION** in February 2021.

OSTHEIMER's residence at the **WOODLAND PLACE LOCATION** is supported by the fact that his uncle resides at that location.  OSTHEIMER lives with his uncle because, as confirmed by a Sharon Police Department officer who is familiar with OSTHEIMER, OSTHEIMER cannot live with his parents.  In addition, GPS location data for OSTHEIMER's cell phone in recent weeks has consistently placed him there late at night and in the early morning.  This is consistent with OSTHEIMER residing and storing items at the **WOODLAND PLACE LOCATION**.

Furthermore, on May 28, 2021, physical surveillance and GPS location data for OSTHEIMER's cell phone revealed his extended presence at the **WOODLAND PLACE LOCATION**.  An agent observed London PINKINS drop OSTHEIMER off at that location and observed OSTHEIMER enter the location.  The GPS location for OSTHEIMER's cell phone placed him at the **WOODLAND PLACE LOCATION** at that time as well as for an extended period of time thereafter that day.

A phone call was also intercepted between OSTHEIMER and PINKINS/TT1 that day during which PINKINS asked, "Where the fuck is you at?". OSTHEIMER replied, "Where you at?". PINKINS then stated, "I'm back." OSTHEIMER replied, "Uh I, I'm getting up now." At this time, the GPS location data for OSTHEIMER's phone placed him at the **WOODLAND PLACE LOCATION**.

It should be noted that, as revealed by GPS data for PINKINS's TT1 and communications intercepted over TT1, on this same day (May 28) PINKINS had just returned from a trip to Detroit, MI, where he likely obtained kilogram amounts of cocaine. During this phone call with OSTHEIMER, agents observed PINKINS at the **WOODROW COURT LOCATION** in possession of brick-shaped objects in a plastic bag that were consistent with the shape and size of kilos.   PINKINS then took the bag into the **WOODROW COURT LOCATION.**

PINKINS was thereafter observed coming and going from the **WOODROW COURT LOCATION**, at one point carrying the plastic bag.  He left in a black Jeep. Approximately 35 minutes later, agents observed PINKINS arrive back at the location, this time with OSTHEIMER, and entered the **WOODLAND PLACE LOCATION**.

 OSTHEIMER is a primary drug dealer for London PINKINS's crew as demonstrated by the information previously included in this affidavit which will not be repeated here for the sake of efficiency.  The investigation has generated additional evidence of OSTHEIMER's consistent drug dealing for at least the last year.  For example, several controlled purchases of narcotics have been made from OSTHEIMER during the last year, some of which were near the **WOODLAND PLACE LOCATION**.

 On July 31, 2020, agents with the Pennsylvania Attorney General's Office utilized a confidential source to conduct a controlled purchase of heroin/fentanyl from OSTHEIMER at a location near the **WOODLAND PLACE LOCATION**. Prior to the controlled purchase, agents met with the CS and provided the CS with $160.00 for the purchase of 2 grams of heroin/fentanyl from OSTHEIMER. While in the presence of agents, the CS sent/received messages to/from OSTHEIMER arranging the drug deal.

OSTHEIMER directed the CS to meet him on George Street Extension in Sharon, PA, to do the deal which is located in the vicinity of the **WOODLAND PLACE LOCATION**.

Agents then followed the CS directly to the area of George Street Extension and Carnegie Avenue in Sharon, PA. OSTHEIMER was observed by mobile surveillance standing at the corner of George Street Extension and Carnegie Avenue. Agents observed OSTHEIMER at the passenger side of the CS's vehicle for a short time. OSTHEIMER was then observed walking away in the direction of the **WOODLAND PLACE LOCATION** as the CS drove away. Agents continued surveillance on OSTHEIMER and observed OSTHEIMER walking in the driveway of the **WOODLAND PLACE LOCATION** and meeting with London PINKINS.

Agents also followed the CS directly back to the pre-determined meeting location. The CS turned over a clear knotted baggie containing a powdery pink substance that he/she stated was just purchased from OSTHEIMER.  The knotted baggie with pink powder substance was subject to a field test and did test positive for the presence of fentanyl.

 In addition to the controlled purchase of heroin/fentanyl from OSTHEIMER in July 2020, in August 2020 the CS again purchased heroin/fentanyl from OSTHEIMER. The same procedures were followed arranging the controlled purchase. OSTHEIMER directed the CS to again meet on the corner of George Street Extension and Carnegie Street, Sharon, PA. The CS was then followed directly to George Street Extension where OSTHEIMER was observed approaching the CS's vehicle and meeting with the CS for a short time.

OSTHEIMER and the CS then departed and traveled in separate directions. Agents followed the CS directly back to the pre-determined meeting location where the CS

relinquished a clear plastic baggie containing approximately 3.0 grams of a powdery pink substance that did field test positive for the presence fentanyl. Surveillance was also continued on OSTHEIMER as he left the area after the meeting with the CS.  OSTHEIMER was observed walking back to the **WOODLAND PLACE LOCATION** and entering the residence.

>       **Q.    HOME    STREET    LOCATION    AND    TERRACE    AVENUE LOCATION**

The **HOME STREET LOCATION** is a single-family house, with white siding on the exterior, and a driveway behind the house that is adjacent to an alleyway on the right side of the house. The front door is located under an overhanging porch roof with the number "302" affixed to the side of the door.  This is the residence of Forrest GILMORE's mother that he and others use to traffic illegal drugs.

The **TERRACE AVENUE LOCATION** is a two-story, single-family house with gray siding and a covered front porch.  The front door is located to the left side of the front porch.  The house number "117" is affixed to the mailbox located to the left of the front door.  There is an alleyway located to the right of the house that leads to a parking area at the rear of the house.   This is the residence of Melvin DORSEY-PACE that he and others use to traffic illegal drugs.

As stated above, one of the indictments charges Forrest GILMORE, Melvin DORSEY-PACE, and Rayjzon SAMS with conspiring to distribute, possessing with intent to distribute, and/or distributing crack cocaine and cocaine between June 2020 and June 2021.  This indictment is a result of the Lawrence County component of the investigation. GILMORE, DORSEY-PACE, and SAMS are closely associated, recidivist drug dealers centered in New Castle, Pennsylvania.

GILMORE, DORSEY-PACE, and SAMS worked together to distribute 28+ grams of cocaine base, as well as powder cocaine, between June 2020 and June 2021. Each of them was previously convicted of a serious drug felony/21 U.S.C. § 851 predicate as listed in the pending indictment. GILMORE and DORSEY-PACE were both on federal supervised release in 2020 and 2021 after being released from BOP custody in March/April 2020 following 60-month sentences imposed in this district for conspiring to distribute cocaine base together in 2015. SAMS was on bond in 2020/2021 in multiple state drug trafficking and firearm cases and he has drug trafficking and aggravated assault convictions in the Lawrence County Court of Common Pleas.

Agents for this investigation have regularly conducted surveillance of the **HOME STREET** and **TERRACE AVENUE LOCATIONS**, both of which are in New Castle, PA, throughout this investigation, including in recent weeks. The **TERRACE AVENUE LOCATION** is where DORSEY-PACE is residing with his girlfriend Hayla TIPPER. The **HOME STREET LOCATION** is the residence of Lisa GILMORE, Forrest GILMORE's mother.

The surveillance of the **HOME STREET LOCATION** has included transmission of simultaneous pole camera video for several months as well as physical surveillance at both locations. GILMORE, DORSEY-PACE, and SAMS have been observed at both locations on many occasions, including in recent weeks. Some of these occasions have directly connected with drug trafficking events as detailed below. During some of these occasions, behavior that is very consistent with drug trafficking was observed also as detailed below.

CS3 has recently confirmed that the **TERRACE AVENUE LOCATION** is where DORSEY-PACE is residing.  Surveillance during the last two weeks, including on June 8, 2021, and June 11, 2021, corroborates this information.  On June 11, 2021, DORSEY-PACE and his vehicle were observed at the location several times throughout the day.

On June 8, 2021, agents established fixed surveillance in the vicinity of the **TERRACE AVENUE LOCATION**. At approximately 12:12 pm, a blue Ford Escape arrived and parked in the rear of the residence. Shortly after its arrival, an unknown male was observed walking from the direction of a side door of the **TERRACE AVENUE LOCATION** and meeting with the driver of the vehicle. Approximately two minutes after it arrived, the blue Ford Escape departed.

At approximately 2:06 pm, a white Ford SUV arrived at the **TERRACE AVENUE LOCATION** and parked in the rear driveway. An unknown female exited the passenger side of the vehicle and walked toward the side door of the residence. The unknown female quickly returned to the vehicle that departed approximately two minutes after it arrived. This short stop-and-go behavior is quite consistent with drug trafficking occurring at the **TERRACE AVENUE LOCATION**.  During that same afternoon, DORSEY-PACE was observed arriving at the location and walking toward the side door.

CS3 has also repeatedly confirmed that the **HOME STREET LOCATION** is used by GILMORE and others to traffic illegal drugs, including to store drug trafficking proceeds (I am aware that drug dealers commonly store proceeds at the homes of their mothers or other close relatives).  For example, on March 12, 2021, CS3 stated that GILMORE, SAMS, and their associates were all at GILMORE's mother's residence/the **HOME STREET LOCATION** with an extremely large amount of money.  Investigators

monitored pole camera electronic surveillance of the **HOME STREET LOCATION**.
While monitoring the **HOME STREET LOCATION**, investigators observed GILMORE,
SAMS, and other associates gathered outside of the residence and entering/exiting the back
door several times.

During the last few weeks, GILMORE has posted public Snap Chat stories under
his handle "Wavy-foe."   Some of them showed GILMORE at the **HOME STREET
LOCATION**.  GILMORE was with Jerell WEATHERSBY who, as confirmed by CS3, is
a Buffalo-based source of supply for GILMORE.

The following chronological summary of events, in addition to the information
previously included in other sections of this affidavit, establishes that GILMORE,
DORSEY-PACE, SAMS, and their crew are engaged in drug trafficking, have been so
engaged for a long time, and use the **HOME STREET LOCATION** and the **TERRACE
AVENUE LOCATION** to further their drug trafficking.

In mid-June 2020, under the direction of the Lawrence County Drug Task Force
(LCDTF), C3 conducted a controlled purchase of approximately one ounce of crack
cocaine from GILMORE in New Castle, PA. During this purchase, CS3 intended to obtain
one-half ounce of crack cocaine from GILMORE, for $1,400 (official LCDTF funds).
GILMORE, however, gave CS3 one ounce of crack cocaine. GILMORE then expected
CS3 to pay him at a later time for the other half ounce of crack cocaine that he provided to
CS3.

During the last week of June 2020, under the direction of the DEA and the LCDTF,
CS3 conducted a controlled payment of $1,500 to GILMORE for the original one ounce of
crack cocaine that GILMORE provided to CS3, which took place in New Castle, PA, at

the **HOME STREET LOCATION**. Law enforcement followed CS3 to this location, where CS3 paid GILMORE for the crack cocaine that GILMORE had previously provided. Law enforcement was able to observe GILMORE place the money into his pocket, and eventually enter the location with the money for the crack cocaine.

In mid-September 2020, under the direction of the DEA and the LCDTF, CS3 contacted GILMORE through text message communication that resulted in a controlled purchase of two ounces of crack cocaine from Forrest GILMORE at the **HOME STREET LOCATION**. Following the purchase of this crack cocaine, the drugs were field tested and tested positive for the presence of crack cocaine.

On December 22, 2020, investigators conducted pole camera surveillance of the **HOME STREET LOCATION**. During the early afternoon, Daquan DUKES was observed exiting the residence carrying a brown paper bag. As noted above, DUKES is one of GILMORE's associates who was involved in searching for GILMORE's cocaine that was discarded during a PSP pursuit in August 2020.

Immediately after DUKES walked out the door of the **HOME STREET LOCATION** on December 22, 2020, DUKES placed the bag he was carrying in a black sedan parked adjacent to the residence before departing the area in a Hyundai Elantra. It should be noted that the black sedan had not moved since the installation of the pole camera and no persons had been observed attempting to operate it. Approximately 20 minutes later, DUKES returned to the residence in the Hyundai Elantra, and, after exiting the Elantra, immediately accessed the black sedan to retrieve the brown paper bag. DUKES then returned to the Hyundai Elantra with the brown paper bag and sat in the front driver's seat. Shortly thereafter, DUKES entered the **HOME STREET LOCATION**. After a short

period of time, DUKES exited the residence, departed in the Hyundai Elantra, and then returned to the residence after approximately three minutes. These observations of DUKES are quite consistent with someone involved in drug storage and distribution at the **HOME STREET LOCATION**.

On January 19, 2021, additional pole camera surveillance in the vicinity of the **HOME STREET LOCATION** revealed what appeared to be a hand-to-hand narcotics transaction in the alley. At approximately 3:07 p.m., Melvin DORSEY-PACE, Tavin WISE, and two unknown persons were observed loitering around parked vehicles in the alley. WISE then appeared to utilize a cellular telephone as he looked in both directions of the alley. WISE then entered the front-passenger seat of one of the vehicles with the door remaining open. Less than two minutes later, an unknown female was observed walking down the alley toward WISE's location. The unknown female met with WISE at the door of the vehicle and then quickly walked back toward the direction she came from. Shortly thereafter, WISE exited the vehicle and was observed manipulating what appeared to be U.S. currency in his hands.  These observations of WISE are quite consistent with someone involved in drug distribution.

On January 29, 2021, law enforcement officers involved in this investigation were once again monitoring electronic/pole-camera video of the **HOME STREET LOCATION**.  While conducting this electronic surveillance, agents continued to observe a white Ford Explorer, bearing Pennsylvania registration LMC-8491, arriving at and leaving the area of the location numerous times. Officers determined the vehicle was registered to a family member of Melvin DORSEY-PACE.

Officers monitoring the surveillance were able to identify the driver of the Ford Explorer as DORSEY-PACE. DORSEY-PACE was repeatedly observed exiting the **HOME STREET LOCATION**, entering the Ford Explorer, driving away from the location, returning shortly thereafter, and ultimately re-entering the location. This behavior was consistent with someone conducting repeated drug deals away from the location and then returning to the location to store the proceeds and to obtain more narcotics.

Law enforcement officers continued monitoring the actions of DORSEY-PACE at the **HOME STREET LOCATION** that day. At one point, officers observed DORSEY-PACE with what appeared to be a firearm with an extended magazine in his left hand. DORSEY-PACE is a convicted felon who is prohibited from lawfully possessing a firearm and does not have a valid driver's license. Officers attempted to follow DORSEY-PACE by vehicle multiple times that day, but such physical surveillance was often thwarted by counter-surveillance erratic-driving tactics. At one point, DORSEY-PACE drove the wrong way on a one-way street. Had officers attempted to follow him, he likely would have confirmed what he may have already suspected – that officers were attempting to conduct physical surveillance of him.

Later that day, officers conducting this investigation requested assistance from the New Castle Police Department in conducting a vehicle code violation-based traffic stop of DORSEY-PACE. Shortly thereafter, a NCPD patrol officer located the Ford Explorer DORSEY-PACE was driving on West State Street in New Castle. The NCPD officer began to follow the Ford Explorer from a distance, but DORSEY-PACE quickly became aware of the police vehicle behind him. DORSEY-PACE immediately started making abrupt turns onto various streets and circling blocks in an attempt to thwart physical

surveillance and possibly to discard contraband from the vehicle without being seen. After the vehicle failed to stop at a marked stop sign, the NCPD officer initiated a traffic stop. DORSEY-PACE was identified as the driver, Forrest GILMORE was identified in the backseat. Two other males (i.e., an adult and a juvenile) were also in the vehicle.

During the traffic stop, NCPD officers noticed the Ford Explorer had a strong odor of marijuana emanating from the interior of the vehicle. Due to none of the occupants having a valid driver's license and the strong odor of marijuana inside the vehicle, NCPD officers detained the occupants and towed the vehicle pending the application and service of a search warrant. Officers located, among other things, $633 on DORSEY-PACE and $761 on GILMORE. After the search warrant was obtained and served, only a marijuana blunt was found in the vehicle. All persons were allowed to depart at that time.

In early April 2021, agents conducted a controlled purchase of crack cocaine from DORSEY-PACE utilizing a local Lawrence County Drug Task Force Confidential Source. Agents established physical surveillance at the **TERRACE AVENUE LOCATION** and then directed the CS to contact DORSEY-PACE for the purchase of crack cocaine. Agents then observed DORSEY-PACE, GILMORE, and SAMS entering and exiting the **TERRACE AVENUE LOCATION**.

After calls and texts were exchanged between the CS and DORSEY-PACE, and the agreement for DORSEY-PACE to bring the crack cocaine to the CS was established, agents observed DORSEY-PACE exiting the **TERRACE AVENUE LOCATION**. Agents then observed DORSEY-PACE enter a white Chevrolet sedan parked in front of the driveway of the **TERRACE AVENUE LOCATION** and drive away. Agents then followed DORSEY-PACE to where he met with the CS.

Agents observed DORSEY-PACE meet with the CS. After he met with the CS, DORSEY-PACE was followed by agents directly back to the **TERRACE AVENUE LOCATION.** He was observed entering the **TERRACE AVENUE LOCATION.** Following this controlled purchase, agents obtained the suspected crack cocaine from the CS. It field tested positive for the presence of crack cocaine.

In April 2021, judicial authorization was received for the interception of wire and electronic communications over Rayjzon SAMS's telephone with number 724-704-1468. Incriminating communications were thereafter intercepted. For example, on April 12, 2021, SAMS exchanged communications with a male customer using number 412-974-7364. During the initial conversation, the male customer asked whether SAMS was in New Castle, PA, "Are you in the castle?", to which SAMS responded positively, "Yeah." SAMS then asked, "What you need bro?" – in reference to the type and quantity of narcotics the male wanted to purchase. The male responded with the type and quantity he wanted, "a basket of rock", and proceeded to ask SAMS what the price would be, "What's the ticket?" SAMS responded with a price of $300, "Shit three."

Approximately 40 minutes later, the male called SAMS to let him know he was on his way and in a neighboring town, "I'm almost to Mahoningtown". SAMS replied with his current location in the city of New Castle, "Alright, I'll be on the south side", and more specifically provided a location near Pollack Avenue, "on like Pollock". After a series of phone calls coordinating the location to meet, SAMS called the male informing him that SAMS was in the process of obtaining the narcotics to be delivered, "Yeah my bad bro I was, I was trying to get it for you." SAMS then asked the male where he was currently located, "where are you right now?" The male responded that he was at the housing projects

on Sciota Street in New Castle, "In the back parking lot of Sciota, in the middle", further describing his location, "right across from the dumpster".

A few minutes after this communication, pole camera surveillance showed SAMS walking out the back door of the **HOME STREET LOCATION** followed by Daquan DUKES. DUKES was observed walking directly to the front driver-side door of a black Mitsubishi SUV. SAMS returned back into the residence and then came back out of the residence and entered the front passenger seat of the Mitsubishi SUV. The vehicle was then observed driving away from the location.

About two minutes later, SAMS called the male customer to inform him that SAMS was arriving for the narcotics transaction, "I'm pulling up". An officer with the New Castle Police Department observed the meeting between the male customer and SAMS/the Mitsubishi SUV at the location they selected for the drug deal. The meeting lasted about a minute. About two minutes later, SAMS and DUKES were observed returning to, and entering, the **HOME STREET LOCATION**.

Shortly after the meeting, the New Castle P.D. officer conducted a traffic stop of the male customer. A subsequent search resulted in the discovery of a relatively small amount of cocaine base in the customer's possession. This PWID/distribution event is one of the counts charging SAMS in the pending indictment.

On April 25, 2021, SAMS called and spoke with GILMORE about the distribution of narcotics. GILMORE's phone number at that time was identified by CS3. During the April 25 call between SAMS and GILMORE, GILMORE asked, "What's good cuz?" – inquiring about whether SAMS was able to hook them up with a drug supplier. SAMS answered, "Yeah. He ain't, he ain't gonna be back in uh, back in town 'til tomorrow. He

up in Cleveland and I ain't wanna go to his brother. His brother be tryin' to charge me 14" – explaining that SAMS was not able to hook GILMORE up with the preferred drug supplier yet because the supplier was out of town and the supplier's brother charges too much for the drugs GILMORE wanted to acquire.

GILMORE replied to SAMS's explanation by stating "Shit tomorrow cool" – indicating that GILMORE was willing to wait until the preferred supplier was back from Cleveland.  SAMS then stated, "Aight. But I definitely, but I definitely got you though. Imma grab it for you" – informing GILMORE that SAMS would hook GILMORE up when the preferred supplier returned from Cleveland.  GILMORE then told SAMS "Yeah I know. I'm on your time. It's cool man" – expressing confidence that SAMS would hook him up as discussed.

Also in April 2021, while conducting electronic surveillance, agents observed GILMORE and his paramour, Paige SEARS, arrive at the rear of the **HOME STREET LOCATION**. GILMORE was observed handing SEARS a large stack of money, and then both GILMORE and SEARS departed from the rear of the **HOME STREET LOCATION**. Approximately 15 minutes later, GILMORE and SEARS returned in their respective vehicles. GILMORE exited his vehicle and entered the rear of the **HOME STREET LOCATION**. Several minutes later, GILMORE exited the location. SEARS and

GILMORE exchanged vehicles and then both parties departed from the area.


*s/Jeffrey T. Morell*
Jeffrey T. Morell
DEA-Task Force Officer


Sworn and subscribed before me, by telephone
pursuant to Fed.R.Crim.P. 4.1(b)(2)(A),
this 15th day of June 2021.


_____
HONORABLE LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE